**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

NRRM, LLC, d/b/a CARSHIELD, and AMERICAN AUTO SHIELD, LLC,

Plaintiffs,

vs.

PELICAN INVESTMENT HOLDINGS, LLC, et al.,

Defendants.

Case No. 4:25-cv-01566

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF CARSHIELD'S MOTION FOR PERLIMINARY INJUNCTION**

DICKINSON WRIGHT PLLC
Jeffrey H. Kass (E.D. Mo. #60672)
1125 17th Street, Suite 550
Denver, CO 80202
Tel: (303) 723-8403
Fax: (844) 670-6009
jkass@dickinsonwright.com

*Counsel for Plaintiffs*

Dated: October 20, 2025

# TABLE OF CONTENTS

Pages


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. Plaintiffs and Their Business ........ 3

B. Defendant Pelican's False Statements and Conduct ........ 5

C. Irreparable Harm to CarShield ........ 8

III. LEGAL STANDARD ........ 10

IV. ARGUMENT ........ 11

A. CarShield is Likely to Succeed on the Merits of its False Advertising Claims ........ 11

1. CarShield is Likely to Prevail on its Lanham Act Claims ........ 12

a. Pelican's Marketing Practices Contain False and Misleading Statements ........ 12

b. Pelican's Marketing Practices Constitute Commercial Advertising ........ 13

c. Pelican's Marketing Practices Have a Tendency to Deceive Consumers ........ 14

d. Pelican's False Representations are Material ........ 15

e. Pelican's Caused the False Statements to Enter Interstate Commerce ........ 16

2. CarShield is Likely to Prevail on its Injurious Falsehood Claim under Missouri Common Law ........ 17

a. Pelican Published False Statements With Knowledge or Reckless Disregard ........ 17

b. Pelican Intended or Should Have Recognized that its Statements Would Cause Pecuniary Harm ........ 18

c. Pelican Published False Statements ........ 19

d. CarShield Suffered Pecuniary Loss ..... 19

3. CarShield isLikely to Prevail on its Unfair Competition Claim under Missouri Common Law ..... 19

B. CarShield is Suffering and Will Continue to Suffer Irreparable Harm Absent an Injunction ..... 21

C. The Balance of Equities Favors CarShield ..... 22

D. The Public Interest Supports Granting the Injunction ..... 23

E. No Bond Should Be Required Under Rule 65(c) ..... 23

V. CONCLUSION ..... 24

## TABLE OF AUTHORITIES

Pages

Cases

*Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.*,
434 F.3d 1100 (8th Cir. 2006) .......... 12

*Annbar Assocs. v. Am. Express Co.*,
565 S.W.2d 701 (Mo. App. 1978) .......... 17

*Auto-Chlor Sys. Of Minn., Inc. v. JohnsonDiversey*,
328 F. Supp. 2d 980 (D. Minn. 2004) .......... 14

*Blue Buffalo Co. v. Nestle Purina Petcare Co.*,
2015 WL 3645262 (E.D. Mo. Jun. 10, 2015) .......... 13, 14

*Buetow v. A.L.S. Enters., Inc.*,
650 F.3d 1178 (8th Cir. 2011) .......... 12, 14

*Charter Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
202 F. Supp. 2d 918 (E.D. Mo. 2001) .......... 11, 15

*Corizon, Inc. v. Wexford Health Sources, Inc.*,
2013 WL 3821268 (E.D. Mo. Jul. 23, 2013) .......... 15

*Council on Am.-Islamic Rels.-Minnesota v. Atlas Aegis, LLC*,
497 F. Supp. 3d 371 (D. Minn. 2020) .......... 24

*Creative Compounds, LLC v. ThermoLife Int'l, LLC*,
669 S.W.3d 330 (Mo. Ct. App. 2023) .......... 17

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109 (8th Cir. 1981) .......... 10, 11

*Deflecto, LLC v. Dundas Jafine Inc.*,
142 F. Supp. 3d 835 (W.D. Mo. 2015) .......... 12

*Doe v. TCI Cablevision*,
110 S.W.3d 363 (Mo. 2003) .......... 19

*Eli Lilly & Co. v. Arla Foods, Inc.*,
893 F.3d 375 (8th Cir. 2018) .......... 13

*Gen. Mills, Inc. v. Chobani, LLC*,
158 F. Supp. 3d 106 (N.D.N.Y. 2016) .......... 23

*Goff v. Harper*, 60 F.3d 518 (8th Cir. 1995) .......... 11

*Home Instead, Inc. v. Florance*,
721 F.3d 494 (8th Cir. 2013) ........................................................................................ 10

*Hubbs Mach. & Mfg., Inc. v. Brunson Instrument Co.*,
635 F. Supp. 2d 1016 (E.D. Mo. 2009)............................................................................ 19

*Johnson & Johnson Vision Care Inc.*,
299 F.3d 1242 (11th Cir. 2002) ...................................................................................... 15

*MSP Corp. v. Westech Instruments, Inc.*,
500 F. Supp. 2d 1198 (D. Minn. 2007)............................................................................ 11

*Ozkay v. Equity Wave Lending, Inc.*,
2020 WL 12764953 (N.D. Cal. Nov. 25, 2020) .............................................................. 11

*Porous Media Corp. v. Pall Corp.*,
110 F.3d 1329 (8th Cir. 1997) ........................................................................................ 21

*Process Controls Int'l, Inc. v. Emerson Process Mgmt.*,
753 F. Supp. 2d 912 (E.D. Mo. 2010).............................................................................. 12

*Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*,
826 F.3d 1030 (8th Cir. 2016) ........................................................................................ 24

*Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*,
988 F. Supp. 2d 1047 (D. Minn. 2013)............................................................... 11, 14, 15

*Sream, Inc. v. Sahebzada*,
2019 WL 2180224 (N.D. Cal. Mar. 6, 2019).................................................................. 22

*State ex rel. BP Prods. N. Am. Inc. v. Ross*,
163 S.W.3d 922 (Mo. 2005) ............................................................................................ 17

*Stockslager v. Carroll Elec. Coop. Corp.*,
528 F.2d 949 (8th Cir. 1976) .......................................................................................... 24

*Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*,
83 F. Supp. 2d 1016 (D. Minn. 2000).............................................................................. 11

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
497 F.3d 144 (2d Cir. 2007)............................................................................................ 14

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992)......................................................................................................... 23

*United Indus. Corp. v. Clorox Co.*,
140 F.3d 1175 (8th Cir. 1998) ......................................................................... 12, 14, 15, 21

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 10

Statutes

15 U.S.C. § 1116(a) .......... 21

15 U.S.C. § 1125 .......... 11, 12, 16

Other Authorities

Restatement (Second) of Torts § 623A .......... 17

Restatement (Third) of Unfair Competition § 2 .......... 20

Restatement (Third) of Unfair Competition § 3 .......... 20

Restatement (Third) of Unfair Competition § 6 .......... 20

Rules

Fed. R. Civ. P. 65 .......... 23

## I. INTRODUCTION

This case arises from a competitor's deliberate campaign to mislead consumers about who Plaintiffs NRRM, LLC d/b/a CarShield and its affiliated administrator, American Auto Shield, LLC ("AAS"), are and what they do. CarShield has spent years earning the trust of customers and repair shops nationwide by offering reliable, transparent vehicle protection plans—plans that are honored in repair shops and car dealerships across the country and administered directly by CarShield's own team of professionals at AAS. That trust is the lifeblood of CarShield's business.

Yet Defendant Pelican Investment Holdings, LLC d/b/a Auto Service Department has chosen to attack that trust head-on with lies. Through state and national telemarketing campaigns, Pelican has been calling consumers, including CarShield's customers, and telling them that repair shops and car dealers will not accept CarShield's plans and that CarShield does not administer its own claims. Neither statement is true. Repair shops and dealers accept CarShield's plans every day, and CarShield does administer its own claims internally through its affiliate administrator AAS.

To add insult to injury, Pelican has also represented that, unlike CarShield, Pelican handles and pays repair claims itself. That too is false. National Administrative Service Co., LLC ("NASC"), an unrelated company, is Pelican's third-party claims administrator. CarShield and AAS are part of the same family of companies. Pelican and NASC are not.

Pelican's statements are not careless exaggerations or harmless puffery. They are specific, verifiable falsehoods about the core functionality of CarShield's product, made to divert customers through deception. False claims of this kind are especially harmful in this industry, where consumers often make purchasing decisions in real time, over the phone, based on representations about coverage, claim handling, and repair-shop acceptance. When consumers

are told that a protection plan is unusable or untrustworthy, they walk away. Once those doubts take hold, they spread quickly, undermining brand confidence, and linger long after the truth is revealed.

CarShield has built a business on the promise that its vehicle service contracts are honored and that claims are handled by an affiliated, in-house team of professionals, not by some outside administrator. Pelican's misrepresentations directly undermine that value proposition, misleading consumers at the point of sale and causing lost business, confusion, and reputational harm to CarShield.

The consequences have already been felt. CarShield's customer-service department has fielded a growing number of inquiries from confused customers who report having been contacted by Pelican's telemarketers using spoofed numbers and repeating these false statements. Each inquiry reflects the spread of Pelican's deception and its corrosive effect on consumer confidence.

These incidents have strained internal operations, diverted resources from normal customer service, and forced CarShield to retrain sales and support staff to counter the misinformation circulating in the marketplace. More importantly, they have inflicted lasting harm to Plaintiffs' goodwill and reputation and resulted in losses of business that cannot be completely calculated. Once customer trust is shaken by false statements of this kind, it cannot be fully restored as each new call erodes confidence in the brand, compounds confusion, and magnifies the damage already done.

This is precisely the type of misconduct Congress sought to prevent when it enacted Section 43(a) of the Lanham Act. The statute exists to protect businesses and consumers alike from the corrosive effects of false advertising in interstate commerce. It ensures that competition

turns on the merits of a company's products and services, not lies about its rivals. Courts in this circuit have long recognized that when false statements strike at the heart of a competitor's reputation, prompt injunctive relief is not just appropriate but essential to prevent lasting harm.

CarShield easily satisfies the four factors governing preliminary injunctions under Rule 65 of the Federal Rules of Civil Procedure and its progeny. They are likely to succeed on the merits because Pelican's statements are literally false and materially misleading. They face irreparable harm from lost goodwill, reputational injury, and customer diversion—including an unknown amount of diverted customers who cannot be identified or quantified but whose loss is no less real. The balance of equities favors CarShield because Pelican has no lawful interest in continuing a campaign built on falsehoods. And the public interest, grounded in the integrity of truthful commerce and consumer protection, strongly supports injunctive relief.

For these reasons, CarShield respectfully asks the Court to grant its motion and enjoin Pelican from continuing to spread these false statements while this action is pending. Without intervention, Pelican's deception will continue to erode consumer trust and inflict irreparable harm on CarShield—one consumer, one sale, and one call at a time.

## II. BACKGROUND

### A. Plaintiffs and Their Business

Plaintiffs CarShield and its affiliated claims administrator American Auto Shield (AAS for short) operate together in the national market for extended car warranties, technically referred to as vehicle service contracts or protection plans. Their business is simple in concept but critical in practice: they protect millions of vehicles and drivers across the United States from the unexpected cost of repairs. (*See* Declaration of Nicholas Hamilton ("Hamilton Decl.") ¶¶ 3-4, attached as Exhibit 1.) When a covered vehicle breaks down, the consumer can take it to a repair shop or dealership, where a covered claim is authorized and paid through CarShield's affiliate

repair claims team at AAS. (*See id.* ¶ 14.) CarShield markets and sells the plans. AAS administers them on CarShield's behalf. Together, they deliver what consumers value most in this industry: reliability, transparency, and a straightforward process when something goes wrong.

Over many years, CarShield has grown into the nation's leading providers of automotive warranty products. (*See id.* ¶¶ 5, 9.) Since 2016, it has marketed its warranties under a family of federally registered trademarks, including CARSHIELD and CARSHIELD.COM, which it owns and has used continuously in interstate commerce. (*See id.* ¶¶ 6, 8.)[1] Those marks have become synonymous with dependable coverage and responsive service. (*See id.* ¶ 8.) Through sustained national advertising on television and radio, often endorsed by recognizable public figures in the entertainment and news industries, CarShield has built one of the most visible and trusted brands in the extended car warranty industry. Its message has reached consumers throughout the country, generating significant goodwill and brand recognition. (*See id.* ¶ 8.)

That goodwill is not abstract. Consumers associate the CarShield marks exclusively with CarShield's family of companies and the warranties sold under those marks. Dealers and repair facilities likewise recognize the CarShield brand as a symbol of coverage that will be honored and claims that will be handled by CarShield's professional administrators at AAS. ( *See id.* ¶ 9.) The relationship between CarShield's sales operations and AAS's claims administration is seamless and deliberate. CarShield makes it so customer claims will not be outsourced, and AAS fulfills that commitment through direct, internal handling of every claim. (*See id.* ¶ 12.)

[1] *See also* USPTO Reg. Nos. 87171040, 86843423, and 98599345, *available at* https://tmsearch.uspto.gov/search/search-information (last visited Oct. 20, 2025).

This approach of combining national reach with in-house accountability has distinguished CarShield and AAS from most competitors in a crowded marketplace. While many companies—like Pelican—rely on outside administrators or opaque third-party arrangements, CarShield and AAS manage the process internally. (*See id.*) That structure allows them to maintain consistency and a level of customer service that has become their hallmark—an asset that is essential to their continued success and one that competitors, including Pelican, now seek to exploit. (*See id.*)

**B. Defendant Pelican's False Statements and Conduct**

Defendant Pelican, which holds itself to the public as Auto Service Department (or sometimes ASD), is a direct competitor in the same national marketplace for vehicle service contracts. Like CarShield, Pelican markets and sells extended car warranties to consumers across the United States, including in Missouri. But rather than compete on the strength of its own products, Pelican has sought to gain an unfair advantage by spreading false and misleading statements about CarShield and its affiliated administrator AAS. (*See id.* ¶ 13.).

Beginning in or around at least September 2025, Pelican began promoting its protection plans through outbound telemarketing campaigns directed at consumers shopping for or already holding vehicle protection plans. (*See id.* ¶ 13.) On September 10, 2025, Tom Stratchko, the Vice President of Operations at Carchex, another provider of extended auto warranties, received an unsolicited call on his personal cell phone from a spoofed number that appeared to be local but was not in service when called back. (*See* Declaration of Tom Stratchko ("Stratchko Decl.") ¶¶ 1-4, attached as Exhibit 2.)

When Stratchko answered, the caller—later identified as an Auto Service Department (Pelican) salesperson—stated that he was calling CarShield customers to put them into new coverage because car dealers and repair shops were no longer accepting CarShield. (*See id.* ¶ 4.) The caller further represented that his company was a direct-pay administrator that pays repair

claims directly, unlike CarShield, which the caller represented did not. (*See id.* ¶ 6.) The salesperson advised Stratchko to cancel his CarShield coverage and switch to a new plan offered by the caller's company. The caller even offered to walk Stratchko step by step through the cancellation process after making the switch. (*See id.* ¶¶ 7-8.)

To confirm who was behind the call, Stratchko completed the purchase. The documents that followed identified the plan as a Pelican-sold vehicle protection plan, administered not by Pelican itself but by National Administrative Service Co., LLC (NASC) and financed by Mepco Finance Corporation ("Mepco"). (*See id.* ¶¶ 5, 9-10; *see also* Pelican's Protection Plan for Tom Stratchko ("Stratchko's VSC"), attached as Ex. A to the Stratchko Decl.) This transaction confirmed that the false statements were made by Pelican's sales representatives and that those misrepresentations were part of Pelican's marketing and sales process. (*See id.*)

The statements the caller made were false. Repair facilities and dealerships across the United States continue to accept CarShield's plans every day, and AAS—CarShield's affiliated administrator—administers all claims internally. (*See* Hamilton Decl. ¶ 14.) CarShield and AAS have not represented otherwise, and no evidence supports the caller's assertions that car dealers and repair shops no longer accept CarShield or that CarShield does not administer its own claims. (*See id.*)

The caller also told Stratchko that the company he represented was a direct-pay administrator that pays repair claims directly. That statement too was false. The documents Stratchko received after the sale show that Pelican does not administer or pay claims itself; its third-party administrator NASC performs those functions, and payments are financed through Mepco. (*See* Stracthko Decl. ¶ 10; *see also* Stratchko VSC, attached as Ex. A to the Stratchko Decl.)

The September 2025 call was not an isolated incident. The caller's explicit reference to "CarShield customers" indicates that Pelican or its agents gained access to nonpublic information identifying CarShield's customer base. (*See id.* ¶ 4; *see also* Hamilton Decl. ¶¶ 10-11.) How Pelican illegally obtained and used that customer data remains unknown, but there would be no legitimate way for Pelican to know who CarShield's customers were or to represent that it was calling CarShield's customers unless it had somehow acquired that nonpublic information improperly. That conclusion is reinforced by calls CarShield has received from its own customers, many of whom were angry or confused after being contacted by Pelican's representatives, asserting the same lies about CarShield again, and claiming they needed to switch coverage. (*See* Hamilton Decl. ¶¶ 15-17.)

For example, in one such call in October 2025, a CarShield customer reported having been contacted by "Auto Service Department," was told by Pelican that Ford no longer accepted CarShield's protection plan "due to lawsuits." This Pelican caller claimed Pelican could provide new coverage at a lower rate and instructed her to cancel her existing CarShield plan. (*See* Declaration of Adam Canada ("Canada Decl.") ¶¶ 1-5, attached as Exhibit 3.)

During the conversation with CarShield's representative, the consumer expressed confusion and concern that she was being scammed, noting that the Pelican representative had pressed her for payment information and falsely suggested her CarShield plan would no longer be honored by Ford dealerships. The CarShield representative confirmed that the statements were untrue, explained that customers had been receiving similar scam calls, and documented the call, which has since been transcribed. (*See id.*; *see, also* Canada Decl. at Exs. A through C (transcripts of consumer calls to CarShield).)

This exchange, and others like it, demonstrate that Pelican's false statements are reaching CarShield's actual customers, sowing confusion and distress, and diverting business through deception.

### C. Irreparable Harm to CarShield

The conduct described above has caused, and continues to cause, concrete harm to CarShield and AAS. (*See* Canada Decl. ¶¶ 6-7; *see also* Hamilton Decl. ¶¶ 16-19.) For Plaintiffs, it would be impossible to determine exactly how many customers have switched to Pelican because of these false statements, but the loss of some number of existing and prospective customers is certain.

The damage extends beyond lost sales. CarShield's reputation, name, and reliability are among its most valuable assets. Their business model depends on consumer confidence that coverage will be honored and claims will be administered fairly. When consumers are told otherwise, even briefly, the resulting doubt extends well beyond a single transaction. In a crowded industry with many extended car warranty providers and in which most marketing occurs by telephone, a false statement spreads quickly and can be difficult to correct. Once a consumer questions whether a plan will be accepted or a claim will be paid, that perception can persist long after the truth is clarified. (*See* Hamilton Decl. ¶ 18.)

The reputational harm to CarShield is therefore significant yet very difficult to measure. CarShield has invested heavily in advertising, brand development, and compliance to distinguish itself from competitors that rely on outside administrators. Pelican's false statements blur those distinctions, placing CarShield's name alongside misleading claims about plan acceptance and administration. The result is an injury to goodwill that no monetary award can easily and completely repair. (*See id.* ¶¶ 16-19.)

Further evidence of the broader marketplace impact comes from consumer complaints directed at Pelican and its administrator NASC. One such complaint filed with the Better Business Bureau ("BBB") describes nearly identical deceptive practices. The complainant reported receiving an unsolicited sales call from someone claiming to represent Pelican's program, who knew the consumer already had CarShield coverage, asserted that CarShield was "in litigation," and urged the consumer to switch coverage based on those representations. After purchasing a Pelican plan administered by its third-party administrator NASC, the complainant experienced claim denials inconsistent with the written policy and was unable to reach anyone at NASC to cancel the contract. A screenshot of the BBB Complaint is below and is attached as Exhibit 4. The details of it mirror the misrepresentations alleged here and demonstrate that the harm to consumers, and the resulting reputational damage to CarShield and AAS, is ongoing and not limited to a single incident.

**Initial Complaint** | **Type:** Service or Repair Issues

**Date:** 06/26/2025 | **Status:** Answered

I purchased an extended vehicle warranty after being contacted by someone claiming to represent ****** extended warranty program. They stated ***** could offer me lower rates than CarShielddespite knowing I already had that coverageand even claimed CarShield was in litigation.Approximately three months later, my car broke down. The repair shop submitted the required documentation, but my claim was denied, citing that timing belt damage wasnt covered. This contradicted my policy, which clearly includes timing belt and related components. The shops call to the National Administrative Service Co., LLC claims office revealed that the representative not only entered false informationnot provided by anyonebut also was rude, instructing me to redo the process with a different shop. I was forced to pay for the repairs myself.Since then, *** tried to cancel the contract, but it's been impossible to reach anyone to do so. Phone calls go unanswered, and hold times never end. I feel this company is engaging in misrepresentation and deceptive selling, denying legitimate claims, and using unethical customer ********************* tactics. I respectfully request that the BBB investigate this business and take action to prevent similar harm to others.

(*See* Ex. 4.)[2]

---

[2] *See also* Better Business Bureau Complaints, *available at* https://www.bbb.org/us/oh/dublin/profile/auto-warranty-processing/national-administrative-service-co-llc-0302-11005532/complaints (last visited Oct. 20, 2025).

The damage is reflected internally as well. CarShield's customer-service representatives now spend significant time addressing confusion sown by Pelican's telemarketing, answering inquiries from policyholders who have been misled about the validity of their coverage. These interactions have forced CarShield to redirect personnel and resources away from ordinary company and customer work toward damage control—clarifying misinformation, reassuring customers, and documenting reports for further investigation. The cumulative effect has been a measurable drain on resources, operational disruption, increased administrative costs, and compounding harm to Plaintiffs' reputation and goodwill. (*See* Canada Decl. ¶ 7; *see also* Hamilton Decl. ¶ 16.)

Pelican's calls have reached consumers in multiple states, including Missouri, and the scope of the harm continues to expand. Each new call potentially diverts another customer and deepens confusion in the market. Unless restrained, Pelican's false statements will continue to cause an untold loss of customers and erode the trust that CarShield has built with consumers, repair facilities, dealerships, and industry partners nationwide. (*See* Hamilton Decl. ¶¶ 18-19.)

## III. LEGAL STANDARD

A preliminary injunction is warranted when (1) the plaintiff is likely to succeed on the merits, (2) the plaintiff is likely to suffer irreparable harm absent relief, (3) the balance of the equities favors the plaintiff, and (4) relief is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). The Eighth Circuit applies this framework in evaluating requests for preliminary injunctive relief. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). "While 'no single factor is determinative,' the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation omitted) (quoting *Dataphase*, 640 F.2d at 113).

Courts in this circuit routinely grant injunctions in competitive false advertisements cases. *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*, 83 F. Supp. 2d 1016, 1028 (D. Minn. 2000); *Charter Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 202 F. Supp. 2d 918, 930 (E.D. Mo. 2001), *aff'd and remanded*, 23 F. App'x 635 (8th Cir. 2002); *MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1217 (D. Minn. 2007); *Select Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 988 F. Supp. 2d 1047, 1055 (D. Minn. 2013) (immediately enjoining defendant from making representations to consumers regarding Select Comfort and its products or services). The movant simply bears the burden of establishing the propriety of a preliminary injunction. *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995). Ultimately, "the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. And "where the balance of other facts tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation." *Id*.

## IV. ARGUMENT

CarShield easily meets the legal standard for a preliminary injunction against Pelican.

### A. CarShield is Likely to Succeed on the Merits of its False Advertising Claims

Pelican's false and misleading advertising as described above violates the Lanham Act and analogous state laws prohibiting injurious falsehoods and unfair competition under Missouri common law. To obtain preliminary injunctive relief, CarShield needs only demonstrate a likelihood of success on the merits of one of its claims. *See, e.g.*, *Ozkay v. Equity Wave Lending, Inc.*, 2020 WL 12764953, at *2 (N.D. Cal. Nov. 25, 2020) (granting preliminary injunction where "Plaintiffs have made out a prima facie case for relief as to at least one of their claims"). As explained below, CarShield is likely to prevail on each of their causes of action, and certainly on their claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

### 1. CarShield is Likely to Prevail on its Lanham Act Claims

Section 43(a) of the Lanham Act "make[s] certain types of unfair competition federal statutory torts." *Am. Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 434 F.3d 1100, 1102 (8th Cir. 2006); *accord Allsup, Inc. v. Advantage 2000 Consultants, Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005) ("The purpose of [the Lanham Act] is to protect persons engaged in commerce against false advertising and unfair competition.") The statute prohibits "false or misleading representations of fact in commercial advertisements about . . . another person's goods." *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 929 (E.D. Mo. 2010). It provides that any person who, "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of . . . another person's goods, services, or commercial activities, shall be liable in a civil action[.]" 15 U.S.C. § 1125(a)(1)(B).

To establish a claim for false advertising, a plaintiff must show:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statements to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement.

*See Deflecto, LLC v. Dundas Jafine Inc.*, 142 F. Supp. 3d 835, 855 (W.D. Mo. 2015) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998)). Each element is met here.

#### a. Pelican's Marketing Practices Contain False and Misleading Statements

To demonstrate falsity within the meaning of the Lanham Act, as the Eighth Circuit has explained, a plaintiff may show that the statement was literally false, either on its face or by implication, or that the statement was literally true but likely to mislead or confuse consumers. *See Buetow v. A.L.S. Enters., Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011) (observing that there are

two types of statements giving rise to a false advertising claim under the Lanham Act: (1) a "literally false" statement, and (2) a "literally true statement" that "implicitly conveys a false message, is misleading, or is likely to deceive consumers."). A statement is literally false if it is "an explicit representation of fact that on its face conflicts with reality." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (8th Cir. 2018). When an advertisement is literally false, courts presume consumer deception without the need for extrinsic evidence. *See, e.g.*, *Blue Buffalo Co. v. Nestle Purina Petcare Co.*, 2015 WL 3645262, at *4 (E.D. Mo. Jun. 10, 2015).

Here, Pelican's representatives made two specific factual claims: (1) that repair shops and car dealers will not accept CarShield's plans, and (2) that CarShield does not administer its own claims. (*See* Stratchko Decl. ¶ 4, 6.) Both are facially false. Repair facilities and car dealerships across the United States continue to accept CarShield's plans daily, and AAS—the affiliated administrator of CarShield—handles every claim internally. (*See* Hamilton Decl. ¶ 14.) The falsity of these statements is easily confirmed by CarShield's corporate structure, operations data, and internal claims records.

Pelican's additional assertion that it pays repair claims directly is likewise false. (*See* Stratchko Decl. ¶ 6.) The evidence shows that Pelican does not pay claims itself. Rather NASC, an unaffiliated third-party administrator, performs that function, with payments being financed by Mepco. (*See* Stratchko Decl. ¶ 10; *see also* Stratchko VSC.) Because these statements are specific, verifiable, and patently untrue, they are literally false under the Lanham Act.

b. <u>Pelican's Marketing Practices Constitute Commercial Advertising</u>

District courts in this circuit hold that "commercial advertising or promotion" includes (1) commercial speech, (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public. *Select Comfort Corp.*, 988

F. Supp. 2d at 1052-53 (citing *Auto-Chlor Sys. Of Minn., Inc. v. JohnsonDiversey*, 328 F. Supp. 2d 980, 1018 (D. Minn. 2004).

Pelican's conduct satisfies each element. Its telemarketing calls were plainly commercial speech: they were designed to induce sales of Pelican's protection plans. The calls were made by competitor—Pelican operates in direct competition with CarShield—and were intended to influence consumers to switch coverage. The statements were also disseminated to the relevant purchasing public, namely, existing and potential vehicle-service-contract holders nationwide. Pelican's own caller identified the targets as "CarShield's customers," demonstrating both the commercial purpose and the breadth of dissemination. (*See* Stratchko Decl. ¶ 4.)

c. <u>Pelican's Marketing Practices Have a Tendency to Deceive Consumers</u>

The Lanham Act requires a showing that the false statement "actually deceived or has the tendency to deceive a substantial segment of its audience." *United Indus. Corp.*, 140 F.3d at 1180. Where, as here, a statement is literally false, the second element of consumer deception is presumed for purposes of a Lanham Act claim. The Eighth Circuit and district courts within this circuit hold that, once literal falsity is shown, "'the court may grant relief without reference to the advertisement's [actual] impact on the buying public'" because deception is presumed. *See Blue Buffalo Co.*, 2015 WL 3645262, at *4 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)); *Buetow*, 650 F.3d at 1185 (same principle reflected).

That presumption applies squarely here. Pelican's statements—that repair shops and car dealers will not accept CarShield's plans, that CarShield does not administer its own claims, and that Pelican pays repair claims directly—are explicit factual representations that are clearly false. (*See* Hamilton Decl. ¶¶ 3-4, 14.) They are therefore literally false, and under settled law, the

Court must presume that they deceived or had the tendency to deceive a substantial segment of their audience.

Even if that presumption did not apply, Pelican's statements have an inherent tendency to deceive a substantial segment of their audience. False claims that a competitor's product "will not be accepted" or that its "claims are not handled internally" directly undermine consumer trust in that competitor's service. Indeed, when statements are made about the basic functionality or reliability of a competitor's product, those statements are likely to mislead consumers in a material way.

But here, deception isn't speculative. The evidence shows that Pelican's caller expressly invoked CarShield's name, falsely stated that CarShield's coverage was no longer accepted by repair shops, and encouraged customers to cancel their CarShield plans. (*See* Stratchko Decl. ¶ 7.) A reasonable consumer hearing those statements would believe that CarShield's product were unusable or unreliable and that Pelican offered a superior alternative. That is exactly the kind of deception the Lanham Act prohibits. And indeed, customers already exhibited confusion. Imagine how many more did not even call CarShield to investigate further/

d. <u>Pelican's False Representations are Material</u>

A misrepresentation is material when it is "likely to influence the purchasing decision" of a consumer. *United Indus. Corp.*, 140 F.3d at 1180. A plaintiff may establish materiality by demonstrating that "the defendants misrepresented an inherent quality or characteristic of the product." *Johnson & Johnson Vision Care Inc.*, 299 F.3d 1242, 1250 (11th Cir. 2002); *Corizon, Inc. v. Wexford Health Sources, Inc.*, 2013 WL 3821268, at *9 (E.D. Mo. Jul. 23, 2013) (finding materiality where the defendant's advertisements contained literally false statements and referred to the competitor's services); *Select Comfort Corp.*, 988 F. Supp. 2d at 1054 (granting TRO in part in Lanham Act false advertising case because "misleading comparisons can diminish a

product's value in the minds of a consumer"); *Charter Commc'ns, Inc.*, 202 F. Supp. 2d at 930, *aff'd and remanded*, 23 F. App'x 635 (8th Cir. 2002) (finding materiality where the false statements played to a consumer's perception of the quality of the product and would likely lead them to choose the defendant's product over the plaintiff).

Here, false statements about whether a protection plan will be honored at repair shops and who will administer claims go to the very heart of a consumer's purchasing decision. Consumers buy extended vehicle service contracts for peace of mind that repairs will be covered and that the administrator will be reliable. A representation that a competitor's plan "will not be accepted" is inherently material.

The Better Business Bureau complaint referenced above reinforces this point. That consumer purchased a Pelican plan because its representatives claimed CarShield was no longer accepted. That statement plainly influenced purchasing behavior and therefore satisfies the materiality element.

e. <u>Pelican's Caused the False Statements to Enter Interstate Commerce</u>

The Lanham Act requires that the challenged conduct occur "in commerce," meaning in or substantially affecting interstate commerce. 15 U.S.C. § 1125(a). Pelican's false statements meet that standard. Its telemarketing campaign targeted consumers across state lines, using interstate telephone networks to place calls to consumers in multiple states, including CarShield's customers in Missouri and elsewhere, outside of Pelican's home state. (*See, e.g.*, Stratchko Decl. ¶ 3, 10.) In at least one instance, the vehicle protection plan sold through these misrepresentations was transmitted electronically via email across state lines. (*See* Stratchko Decl. ¶ 10; *see also* Stratchko VSC.) There can be no dispute that Pelican's communications entered and affected interstate commerce within the meaning of the Lanham Act.

### 2. CarShield is Likely to Prevail on its Injurious Falsehood Claim under Missouri Common Law

Missouri recognizes a cause of action for injurious falsehood, also known as commercial disparagement or trade libel, which protects a business against pecuniary loss caused by false statements that disparage the quality of its goods or the conduct of its business. *See Creative Compounds, LLC v. ThermoLife Int'l, LLC*, 669 S.W.3d 330, 338 (Mo. Ct. App. 2023); *State ex rel. BP Prods. N. Am. Inc. v. Ross*, 163 S.W.3d 922, 928 (Mo. 2005); *Annbar Assocs. v. Am. Express Co.*, 565 S.W.2d 701, 706 (Mo. App. 1978). The Restatement (Second) of Torts § 623A, which Missouri courts follow, *Creative Compounds*, *supra*, provides that

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

Restatement (Second) of Torts § 623A.

To prevail, a plaintiff must show: (1) the defendant intended or should have recognized that publication of the false statement would cause pecuniary harm; (2) the defendant knew the statement was false or acted in reckless disregard for its truth; (3) the defendant published the statement; and (4) pecuniary loss resulted. *See Creative Compounds*, 669 S.W.3d at 338. Each element is met here.

#### a. <u>Pelican Published False Statements With Knowledge or Reckless Disregard</u>

As detailed above, Pelican's representatives told consumers including CarShield policyholders that repair shops and car dealers no longer accept CarShield's plans, and that CarShield does not administer its own claims. (*See* Stratchko Decl. ¶¶ 4, 6.) Both statements are demonstrably false. Repair facilities and dealers nationwide continue to honor CarShield's

protection plans every day, and all claims are administered directly by AAS, CarShield's affiliated administrator. (*See* Hamilton Decl. ¶¶ 3-4, 14.)

Pelican either knew these statements were false or, at minimum, acted in reckless disregard for their truth. The falsity was not obscure or technical; it concerned the most basic and publicly verifiable aspects of CarShield's business. CarShield is among the largest and most widely advertised vehicle service contract providers in the country, with millions of vehicles covered over the years, repaired at repair shops and car dealerships nationwide. (*See id.*) It defies belief that a company operating in the same market could genuinely think otherwise. How would they even learn of such information? The assertion that car dealers and repair shops no longer accept CarShield is simply facially implausible given its ubiquity and reputation. And it contradicts Pelican's own conduct in specifically targeting *CarShield's customers*, a group whose identities would hold no value unless CarShield's plans remained widely accepted and in force. Pelican's willingness to make such easily disprovable claims therefore demonstrates, at the very least, reckless disregard for the truth.

b. Pelican Intended or Should Have Recognized that its Statements Would Cause Pecuniary Harm

Pelican's purpose in making these statements was to drive sales of its own vehicle service contracts by discrediting CarShield. The telemarketer's script itself demonstrates intent to divert business: consumers were told they "needed to switch" coverage and were even offered step-by-step help to cancel their existing CarShield plans. (*See* Stratchko Decl. ¶ 7.) That conduct shows both intent and foreseeability of pecuniary harm. No reasonable marketer could expect that telling consumers a competitor's product is "no longer accepted" would have any effect other than lost sales for the competitor.

c. Pelican Published False Statements

The false statements were made to consumers over the phone in Pelican's outbound telemarketing campaign, and those communications plainly satisfy the publication element within the meaning of Missouri law. The record includes both a sworn declaration from a recipient of such a call and corroborating consumer complaints reporting the same falsehoods. (*See* Stratchko Decl.; *see also* Canada Decl.)

d. CarShield Suffered Pecuniary Loss

Pelican's false statements have diverted existing and prospective customers, resulting in lost revenue and strained operations. (*See* Hamilton Decl. ¶¶ 15-19.) The pecuniary injury includes lost sales, increased administrative costs, and the expense of addressing widespread consumer confusion. Although the exact amount of loss cannot yet be quantified, these ongoing falsehoods are causing measurable commercial injury to CarShield, and such continuing harm supports the issuance of injunctive relief.

* * *

Accordingly, CarShield is likely to prevail on their claim for injurious falsehood under Missouri common law.

**3. CarShield isLikely to Prevail on its Unfair Competition Claim under Missouri Common Law**

Missouri also recognizes a broad common-law tort of unfair competition, encompassing deceptive marketing and other conduct designed to mislead consumers and gain an unfair commercial advantage. *See Hubbs Mach. & Mfg., Inc. v. Brunson Instrument Co.*, 635 F. Supp. 2d 1016, 1018 (E.D. Mo. 2009) (citing *Doe v. TCI Cablevision*, 110 S.W.3d 363, 368 (Mo. 2003)). Missouri courts look to the Restatement (Third) of Unfair Competition for guidance. *See id.*

Under § 2 of the Restatement (Third) of Unfair Competition, "[o]ne who, in connection with the marketing of goods or services, makes a representation relating to the actor's own goods, services, or commercial activities that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of another" is subject to liability for unfair competition. *See* Restatement (Third) of Unfair Competition § 2. Liability also arises under § 6 when a competitor makes deceptive representations concerning another's goods or services. *See* Restatement (Third) of Unfair Competition § 6.

Here, Pelican's false advertisement campaign fits squarely within the Restatement's definition of deceptive marketing. Through its representatives, Pelican falsely claimed that CarShield's vehicle service contracts were no longer accepted by repair shops and car dealers and that CarShield does not administer its own repair claims. (*See* Stratchko Decl. ¶¶ 4, 6.) These are specific factual misrepresentations made "in connection with the marketing of goods or services" and intended to mislead prospective purchasers. The resulting confusion and diversion of sales demonstrate precisely the "commercial detriment" contemplated by the Restatement.

Under § 3, a representation is to the "likely commercial detriment" of another if it is material (that is, likely to affect consumer conduct) and there is a reasonable basis for believing it has caused or is likely to cause diversion of trade or harm to reputation. Restatement (Third) of Unfair Competition § 3. Both are present here. Pelican's false statements about repair-shop acceptance and claims administration strike at the heart of what consumers value in a vehicle service contract. Those misrepresentations directly influence purchasing decisions, prompting some consumers to cancel their CarShield coverage or decline to purchase it in the first place. The resulting diversion of sales and erosion of goodwill are precisely the harms recognized under Missouri common law.

Accordingly, CarShield also is likely to prevail on their unfair-competition claim under Missouri law.

**B. CarShield is Suffering and Will Continue to Suffer Irreparable Harm Absent an Injunction**

Irreparable harm is presumed in Lanham Act cases where the plaintiff demonstrates likely success on the merits of a false advertising claim. *See United Indus. Corp.*, 140 F.3d at 1183 (holding that loss of goodwill and control over reputation constitutes irreparable harm); *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336-37 (8th Cir. 1997) (affirming injunction where defendant's false statements caused a loss of goodwill and consumer trust); *see also* 15 U.S.C. § 1116(a) ("A plaintiff seeking any injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction").

Even apart from that presumption, the record demonstrates that CarShield is suffering and will continue to suffer irreparable harm. Pelican's false statements deliberately target CarShield's own customers, urging them to cancel existing coverage and switch to Pelican's protection plans based on false statements that attack the core of CarShield's reputation—its reliability and claims-handling integrity. Consumers who hear that "repair shops no longer accept CarShield" or that "CarShield does not administer its own claims" are given a fundamentally incorrect understanding of CarShield's business. That conduct directly causes diversion of sales from CarShield to Pelican and thus loss of established customer relationships, which the Eighth Circuit has recognized as a textbook form of irreparable injury. *See United Indus. Corp.*, 140 F.3d at 1180.

Each day that Pelican continues this campaign, more CarShield customers may be diverted and more confusion sown in the marketplace. The harm is cumulative and self-

perpetuating: once a consumer switches plans based on misinformation, CarShield not only lose that sale and vehicle service contract but also suffer reputational injury among others who hear or repeat the same falsehoods.

### C. The Balance of Equities Favors CarShield

The balance of hardships easily favors CarShield. A party has no equitable interest in continuing false or misleading advertisement. *See, e.g.*, *Sream, Inc. v. Sahebzada*, 2019 WL 2180224, at *10 (N.D. Cal. Mar. 6, 2019) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration), *report and recommendation adopted*, 2019 WL 2180215 (N.D. Cal. Mar. 28, 2019). Enjoining Pelican from making false statements will merely require it to tell the truth, something the law already demands.

By contrast, if no injunction issues, CarShield will continue to suffer ongoing reputational injury, consumer confusion, and diversion of existing and prospective customers—harms that are difficult to quantify. The risk of continued consumer deception and erosion of goodwill far outweighs any inconvenience Pelican may claim from being required to stop its false marketing practices. Each day that Pelican continues its false advertisements, additional consumers may be misled into believing that CarShield's plans are not accepted or that its claims are administered by outside companies.

Moreover, the equities tilt further toward CarShield because if Pelican is permitted to continue promoting its products through false advertising, business will continue to be diverted away from CarShield on the basis of deception rather than legitimate competition. If Pelican wishes to compete, it is free to do so, but not through statements that misrepresent a competitor's products. The injunction CarShield seeks merely halts the misconduct and restores fair competition. That result advances, rather than burdens, equity.

**D. The Public Interest Supports Granting the Injunction**

Finally, the public interest strongly supports preliminary injunctive relief. There is a strong public interest in preventing false advertising of products in the marketplace. Indeed, the Lanham Act exists not only "to protect the public from deceit," but also "to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 782 n.15 (1992). Preventing false or misleading advertising protects consumers from deception and promotes free and fair competition in the marketplace. *See also Gen. Mills, Inc. v. Chobani, LLC*, 158 F. Supp. 3d 106, 121 (N.D.N.Y. 2016) ("It is self-evident that preventing false or misleading advertising is in the public interest.").

Here, the public has an evident interest in receiving truthful information about vehicle service contracts. Consumers depend on accurate representations about whether a protection plan will be accepted at repair shops and how claims are administered. Pelican's conduct undermines that interest by spreading falsehoods designed to confuse consumers, steal customers, and erode confidence in legitimate competitors. Granting a preliminary injunction will restore integrity. It will not prevent Pelican from marketing its own products truthfully, but it will prevent it from misleading the public and diverting business from CarShield and AAS. That outcome serves both the Lanham Act's purpose and the broader public interest in honest commerce.

**E. No Bond Should Be Required Under Rule 65(c)**

Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The rule, however, grants broad discretion to the district court to determine whether a bond is appropriate and, if so, in what amount. *Richland/Wilkin Joint*

*Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (quoting *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976) (the "amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion.")). Courts may waive a bond requirement altogether where, as here, the injunction seeks only to prevent ongoing false or deceptive practices, and the enjoined party will suffer no legitimate harm from compliance with the law. *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d at 1043 (waiving bond); *see also Council on Am.-Islamic Rels.-Minnesota v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 380 (D. Minn. 2020) ("If the public interest favors it, the Court may waive the bond requirement.").

A bond is unnecessary in this case. CarShield seeks to enjoin Pelican and all those acting in concert with it from continuing false and misleading advertising that violates the Lanham Act and Missouri law. Pelican has no lawful interest in engaging in such conduct, and therefore cannot suffer cognizable harm from being required to cease it. Requiring a bond in this context would serve no legitimate purpose. The purpose of Rule 65(c) is to protect defendants from wrongful injunctions that inflict legitimate business harm, not to shield parties from the cessation of unlawful activity. Because the requested injunction merely prohibits Pelican from disseminating false statements, and because any speculative harm to Pelican would be the result of its own misconduct, the Court should exercise its discretion to waive the bond requirement, or alternatively, set a nominal bond in a de minimis perfunctory amount.

## V. CONCLUSION

The Court should issue a preliminary injunction directing Pelican to stop disseminating its false statements about CarShield while this action is pending.

Dated: October 20, 2025

Respectfully submitted,

By: /s/*Jeffrey H. Kass*

Jeffrey H. Kass, E.D. Mo. #60672
Georgiana Gnibus, E.D. Mo. #75573
1125 17th St, Suite 500
Denver, CO 80202
Tel: (303) 723-8400
Fax: (844) 670-6009
Email: JKass@dickinson-wright.com
ggnibus@dickinson-wright.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was electronically filed in this case with the clerk of the court and served on this 20th day of October, 2025, through the Court's CM/ECF system, and CarShield will serve this document using a process server when it serves the Complaint.

*/s/Jeffrey H. Kass*
Jeffrey H. Kass (E.D. Mo. #60672)
*Counsel for Plaintiffs*