**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

NRRM, LLC, d/b/a CARSHIELD, and AMERICAN AUTO SHIELD, LLC,

Plaintiffs,

vs.

PELICAN INVESTMENT HOLDINGS, LLC, et al.,

Defendants.

Case No. 4:25-cv-01566-HEA

**REPLY IN SUPPORT OF**
**PLAINTIFF CARSHIELD'S MOTION FOR PRELIMINARY INJUNCTION**

DICKINSON WRIGHT PLLC
Jeffrey H. Kass (E.D. Mo. #60672)
1125 17th Street, Suite 550
Denver, CO 80202
Tel: (303) 723-8403
Fax: (844) 670-6009
jkass@dickinsonwright.com

[Additional counsel on signature page]

*Counsel for Plaintiffs*

Dated: January 9, 2026

## TABLE OF CONTENTS

Pages


I. INTRODUCTION ........ 1

II. RESPONSE TO SUMMARY OF EVIDENCE ........ 3

III. ARGUMENT ........ 5

A. CarShield is Likely to Succeed on the Merits of Its False Advertising and Injurious Falsehood Claims Raised in Its Motion ........ 5

1. CarShield is Highly Likely to Prevail on Its False Advertising Claims Under the Lanham Act and Missouri State Law ........ 5

a. Pelican's Statements are Literally False ........ 5

b. Pelican's Statements Constitute Commercial Advertising ........ 10

c. Pelican's False Statements are Highly Material ........ 11

2. CarShield is Highly Likely to Prevail on its Injurious False Claim under Missouri State Law ........ 11

B. CarShield has Easily Demonstrated that it will Suffer Irreparable Harm Without an Injunction ........ 13

C. The Balance of Harms Strongly Favors an Injunction ........ 14

D. The Public Interest Also Strongly Supports Granting an Injunction ........ 15

E. There is No Justification for a Bond ........ 15

IV. CONCLUSION ........ 15

# TABLE OF AUTHORITIES

Pages

Cases

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
826 F.3d 1030 (8th Cir. 2016) ........................................................................................ 15

*Time Warner Cable, Inc. v. DirecTV*,
497 F.3d 144 (2d Cir. 2007)........................................................................................... 9

*Tiz, Inc. v. So. Glazer's Wine & Spirits, LLC*,
2024 WL 2785142 (N.D. Ill. May 31, 2024)................................................................... 9

## I. INTRODUCTION

Pelican's response is more notable for what it does not say than what it actually says. Pelican does not deny that it launched a massive nationwide telemarketing campaign targeting CarShield customers in or around September 2025. Pelican does not deny that it knew the consumers it called were CarShield customers. Pelican does not deny that it told active CarShield customers that CarShield's VSCs were no longer accepted at car dealers and repair shops. Pelican does not deny that it told those CarShield customers that CarShield does not administer its own claims. Pelican does not deny that it told those CarShield customers that Pelican administers its own claims. Pelican does not deny that it obtained CarShield's confidential customer list information illegally. And Pelican does not deny that it does not administer its own claims.

Those are the undisputed facts. Those are the lies and falsehoods that form the basis for CarShield's motion. Pelican made them. This is all that's needed to find CarShield likely to succeed on its false advertising and injurious falsehood claims.

Without many options, Pelican tries instead to justify its predatory telemarketing solicitation campaign with a series of distractions and technicalities. None has merit.

*First*, Pelican relies heavily on disputed claims from a prior lawsuit between the FTC and CarShield, as well as complaints pulled from the BBB's website. The FTC case is irrelevant. CarShield settled the FTC case a year prior to Pelican's false-statement telemarketing campaign with no admission of liability. Pelican's salespeople have twisted that lawsuit to create a fictional story about CarShield plans no longer being accepted. And the BBB complaints, most of which were resolved and were small in number compared to CarShield's size, are irrelevant. This case is not about what CarShield said, it's about what Pelican said.

*Second*, Pelican's argument that absolute statements such as "car dealers and repair shops

don't accept CarShield plans" and "CarShield does not administer its own claims" are ambiguous is not credible. Anyone hearing those statements knows they are clear and mean what they say.

Pelican pivots to this "technicality" in order to avoid the mountain of evidence demonstrating Pelican's statements are false. CarShield's VSC plans are accepted at well over 17,000 car dealerships and repair shops, CarShield has over 500,000 active contract holders per month, and CarShield/AAS paid out over $600 million in claims to CarShield customers in just the last two years. And CarShield does handle its own claims through its in-family affiliate AAS. Both are commonly owned and have common primary decision-makers.

*Third*, Pelican unsuccessfully tries to paint its mass targeted telemarketing campaign as a few "one-off" calls to CarShield's customers to avoid the "commercial advertising" prong of Lanham Act false advertising claims. But CarShield's handful of transcribed calls attached to its motion are *examples*. CarShield has received hundreds of calls from existing customers who picked up the phone and called CarShield after receiving Pelican's solicitation calls. And those *known* calls are just the tip of the iceberg. Pelican's own records will show many, many more. CarShield customers were the targeted and relevant purchasing public, and the sheer number of worried calls from confused and distressed CarShield customers demonstrate that Pelican's false statements were highly material. Pelican succeeded in creating the intended confusion.

*Fourth*, Pelican fails to refute CarShield's evidence of (i) irreparable harm to support its Lanham Act claims or (ii) pecuniary harm to support its injurious falsehood claim. Pelican offers no evidence rebutting the extensive declaration testimony of key CarShield decision-makers detailing the irreparable harm to CarShield's reputation and loss of goodwill in its brand. Pelican likewise cannot refute CarShield's loss of actual customers and expense in dealing with Pelican's false statements. It is unbelievable that Pelican tells CarShield's customers to leave CarShield

because its plans are no longer honored but then expects that there will be no irreparable harm to CarShield, or impact on those customers.

In the end, CarShield's path to a preliminary injunction is clear as it satisfies each of the four required factors. While Pelican asks the Court to forego a preliminary injunction hearing, CarShield submits that a hearing would be very helpful. The Court should hear all the evidence, listen to all the witnesses, and review the actual audio of scared and alarmed customers. That's the best way for the Court to get an appreciation of the scope and seriousness of Pelican's false statements: to listen to the recorded calls of CarShield customers, experience the concern and confusion in their voices, and hear about the impact of Pelican's predatory solicitation campaign on CarShield's business. Off-base technicalities don't hold up well in court. Real evidence and real witnesses do. CarShield respectfully requests that the Court grant its motion.

## II. RESPONSE TO SUMMARY OF EVIDENCE

Pelican's summary of the evidence is littered with alleged facts that are untrue, irrelevant, or not facts at all. CarShield will address the particularly egregious ones.

Pelican cites extensively to allegations in prior lawsuit between the FTC and CarShield, and another class action lawsuit against CarShield. (Response, p. 5-7.) Those are all mere allegations and must be ignored. Moreover, CarShield resolved the FTC case in September 2024—nearly a year before Pelican began its telemarketing campaign—with no admissions of liability. Allegations are not evidence.

Pelican also cites extensively to a series of communications from CarShield customers to the Better Business Bureau ("BBB") regarding CarShield and/or CarShield's VSC plans. (Response, p. 7-8.) But Pelican only tells part of the story. CarShield's business profile not only lists an A+ rating from the BBB but also indicates that there were 2722 total complaints over the last 3 years. That's less than 1000 complaints per year. (Ex. 5, Hamilton Decl., ¶25.) Over the

last two years, CarShield customers have filed more than 400,000 claims for covered repairs. (*Id.* at ¶27.) The number of complaints to the BBB over that same time period constitutes less than 0.5% of the total number of claims filed. (*Id.*)

Also, while Pelican cherry picks a few complaints to the BBB, the log of complaints shows that CarShield resolved all or nearly all of the complaints identified by Pelican, with some customers specifically expressing their satisfaction with CarShield. (*Id.* at ¶28.) Some of the so-called complaints are actually compliments. (*Id.*; Response, Ex. C, p. 80, 81, 83, etc.)

Pelican's attempts to write off CarShield's references to former CarShield–customer complaints to the BBB fare no better. (Response, p. 9.) They only drive home CarShield's arguments. The consumer reported on June 26, 2025—nearly a year after the FTC case ended—that Pelican told her that "CarShield was in litigation." (*See* Dkt. 8-4.) The former CarShield customer switched to Pelican. This is the exact problem caused by Pelican's statements.

The same pattern is seen in additional call transcripts. This one is between a CarShield customer (CUSTOMER) and Pelican representative (MERGED PARTY), who was merged into a call with CarShield. The false statements come straight from the horse's mouth:

> CUSTOMER: And how did you know I have CarShield?
>
> MERGED PARTY: Basically because your information is sent to us. Since **CarShield is under litigation at this time**, what we're doing is basically contacting the customers to get them under the correct coverage so that the vehicle stays protected in the meantime.
>
> CUSTOMER: What type of litigation are they under?
>
> MERGED PARTY: **They're in litigation with the Federal Trade Commission** due to a class action lawsuit of over 200,000 customers.

* * *

MERGED PARTY: **They're not taking-- CarShield is not being accepted anywhere. Their policies are no longer being accepted at any manufacturers, dealerships.**

(Ex. 6, Canada Reply Decl., at Ex. D) (emphasis mine).) Pelican cannot hide from their own statements.

Finally, Pelican criticizes the Stratchko and Hamilton Declarations attached to CarShield's Opening Brief. (Response, p. 9-10.) While Mr. Stratchko does work for Carchex, Pelican does not actually dispute any of his evidence. As for Mr. Hamilton, Pelican does not and cannot refute any of his evidence, including Pelican's attempt to mischaracterize CarShield's and AAS's relationship and other key facts. (*See generally* Ex. 5, Hamilton Reply Decl.)

## III. ARGUMENT

### A. CarShield is Likely to Succeed on the Merits of Its False Advertising and Injurious Falsehood Claims Raised in Its Motion

#### 1. CarShield is Highly Likely to Prevail on Its False Advertising Claims Under the Lanham Act and Missouri State Law

Of the five factors required to prove false advertising under the Lanham Act and Missouri state law, Pelican only contests three factors: (1) whether Pelican's false statements are literally false, (2) whether Pelican's false statements constitute commercial advertising, and (3) whether Pelican's false statements concerning who administers the parties' VSC plans are material. Pelican made the claims, Pelican's technicality and word-smithing arguments cannot save them.

##### a. Pelican's Statements are Literally False

For Pelican's **first false statement** that "car dealers and repair shops no longer accept CarShield plans", Pelican tries to manufacture ambiguity. Pelican makes the huge leap that "The alleged statement can only mean that *some*, or perhaps *many*, repair shops and dealerships do not accept CarShield coverage." (Response, p. 16.) Pelican goes on to say that "this statement cannot

plausibly be interpreted to mean that *all shops* will not accept CarShield." (*Id.*) But Pelican did not say any of those things. Pelican's statement unequivocally states that CarShield's VSC plans are no longer accepted at car dealers and repair shops. This is a textbook "explicit representation of fact that on its face conflicts with reality." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (8th Cir. 2018). Pelican can't just make up new statements to avoid liability.

Pelican also tries to justify its false statement because there are some car dealerships or repair shops that don't accept CarShield coverage. (Response, p. 16.) That is irrelevant. That's not what Pelican's telemarketers said, and not the script they followed.

And Pelican's reliance on the FTC's complaint and some select BBB complaints is a classic distraction, a shell game. (*Id.*) Pelican wants the Court to take its eye off the unconverted sworn evidence from CarShield's CEO that car dealerships and repair shops absolutely do accept CarShield's VSC plans every day.

While Pelican tries to challenge that sworn statement (Response, p. 17), it is 100% accurate. CarShield's "Shield Repair Network" consists of approximately 17,000 participating car dealerships, repair shops and other service providers across nearly every state in the United States. (Ex. 7, Currier Reply Decl., ¶¶13-14.) The types of repair facilities in the Shield Repair Network include car dealerships, independent repair shops and non-dealer franchises (i.e. Pep Boys, Aamco, Christian Brothers). (*Id.* at ¶15.) CarShield's VSCs are widely accepted at both thousands of car dealerships and thousands of other repair facilities all across the country: (a) before and after the FTC lawsuit in September 2024, (b) since Pelican started its telemarketing campaign targeting CarShield customers in or before September 2024, and (c) today. (*Id.* at ¶17.)

The evidence of falsity does not stop there. Since January 2024, AAS and CarShield have maintained over 500,000 active VSC contract holders per month. (*Id.* at ¶20.) Also since January

2024, AAS has paid out over $600 million in claims to CarShield customers. (*Id.*) AAS has continued to pay out over $20 million in claims per month both before and after the FTC case. (*Id.*) CarShield VSC plans indisputably continue to be honored in large numbers by thousands of car dealerships and repair facilities, which prima facie evidence proves the literal falsity of Pelican's representations that CarShield's coverage is no longer accepted by car dealerships and/or repair shops.[1]

While the Court should not have to get past literally falsity to assess whether the statements are impliedly false (they are), Pelican argues that its statements cannot be impliedly false because there is no evidence of consumer deception. (Response, p. 17.) This ignores the record. First, the fact that hundreds of confused CarShield customers called CarShield after Pelican's predatory false telemarketing calls is direct evidence of deception and confusion. (Ex. 6, Canada Reply Decl., ¶¶ 8, 13, 23-24, 30.) Second, CarShield presented evidence in its Opening Brief of a former customer who received a Pelican solicitation call with false statements about CarShield and switched to Pelican. (Dkt. 8-4, p. 6.) CarShield prevails both ways.

For Pelican's **second false statement** that "CarShield does not administer its own claims", Pelican contends that CarShield and its affiliated claims administrator AAS do not "share a common parent company" because they are different entities in different states. (Response, p. 18.) That is purely false, as the evidence unequivocally proves otherwise.

First, both CarShield and AAS are commonly owned and have the same primary decision-makers. (Ex. 5, Hamilton Reply Decl., ¶6.) Both CarShield and AAS are ultimately owned by both (a) Swordblocker, LLC ("Swordblocker") and (b) Nick Hamilton and Mark

---

[1] The Canada, Currier and Hamilton Declarations all rely on highly confidential supporting data maintained by CarShield or AAS. Plaintiffs will produce that supporting data upon entry of a protective order, CarShield intends to introduce supporting data at the injunction hearing.

Travis. (*Id*. at ¶7.) Hamilton and Travis own the majority of Swordblocker, and are the ultimate and primary decision-makers for CarShield, Swordblocker and AAS. (*Id*. at ¶¶7-9.)

Second, CarShield's CEO provided sworn declaration testimony that CarShield does not outsource administration of its claims." (Dkt. 8-1, ¶4.) AAS handles administration of all CarShield's claims. (*Id*.) And CarShield's CEO and AAS's President confirm. (*See* Ex. 5, Hamilton Reply Decl, ¶10; Ex. 7, Currier Reply Decl, ¶¶7-8.)

Third, Pelican's reliance on a webpage statement that says AAS "does not outsource claims administration" misses the point. Although separate in form, CarShield and AAS are commonly owned, closely affiliated entities, and CarShield's plans are administered by its in-family administrator, not an unrelated third party. Yet Pelican seized on this distinction to falsely suggest that CarShield customers' claims would be handled by a stranger to signal risks about reliability. That implication is false: CarShield does not farm out claims administration, but relies on an integrated, affiliated administrator to ensure consistency and accountability.

Pelican makes two additional ill-fated arguments. Pelican first cites to allegations in the FTC's 2024 complaint against CarShield to argue that CarShield enlists unrelated third-party administrators. But those allegations (i) pre-date the present lawsuit, (ii) were never admitted by CarShield, and (iii) are simply wrong.

Pelican next cites to the same FTC complaint to argue that "AAS sells its plans through direct marketers other than CarShield." (Response p. 18.) This is just bad. Pelican's cited statement is preceded by the FTC allegation: "From September 2019 to November 2022, AAS has earned revenue of over $1 billion from selling VSCs." Not only does this pre-date Pelican's false statements here, but more egregiously, AAS today only administers CarShield's plans. (Ex. 7, Currier Reply Decl., ¶23.) AAS does not sell its plans through direct marketers other than

CarShield. (*Id.*) This is yet another instance of citations to hallucinated evidence.

Bottom line, CarShield handles its claims through its affiliated administrator AAS. Pelican does not. Those are the facts, and they cannot be credibly disputed.

Case law is also firmly on CarShield's side. While Pelican cites no cases that let its type of false statements off the hook, a number of courts have found statements like Pelican's literally false. For instance, in *Time Warner Cable, Inc. v. DirecTV*, the Second Circuit held that DirecTV's claim that consumers could not get "the best picture" on a big-screen television without *satellite service* was literally false, because *cable service* provided comparable picture quality. 497 F.3d 144, 153–54 (2d Cir. 2007). The court rejected the argument that the statement was mere marketing rhetoric. The court found that claims about whether a competing service can deliver a promised result about technical capability and availability are objective and verifiable. *Id.* Pelican's statements here are even more concrete. Telling customers that CarShield plans are no longer accepted by repair facilities or car dealerships is a verifiable assertion—an exclusive factual proposition that CarShield cannot deliver a promised result, when in fact, it could.

Likewise, a categorical statement to customers that a rival's service "will no longer be accepted" is literally false. Although an antitrust and unfair competition case, in *Tiz, Inc. v. So. Glazer's Wine & Spirits, LLC*, defendants told retailers that they "will no longer accept orders transmitted by third-party e-commerce platforms or services, such as Provi," and that "[o]rders placed via third-party applications or websites such as Provi will not be accepted." 2024 WL 2785142, at *5 (N.D. Ill. May 31, 2024). Like Pelican's false statements here, the court found defendants statements prompted retailer customers to stop using Provi and to contact Provi directly for clarification. *Id*. Also like Pelican, the court found the statements disrupted existing business relationships, and forced Provi to expend substantial time and resources responding to

confusion and attempting to reassure customers following defendants false statements. *Id*.

**b. Pelican's Statements Constitute Commercial Advertising**

Pelican's "commercial advertising" analysis is completely wrong, with two flaws. First, Pelican gets the relevant purchasing public wrong. Pelican argues the relevant market is "every consumer in the United States who owns a vehicle that is no longer under factory warranty." (Response, p. 14.) Pelican claims that this market comprises 85 million consumers. (*Id*.) This is absurd. Pelican was not targeting 85 million consumers with their predatory telemarketing solicitation campaign. Pelican targeted CarShield customers (via a list they obtained improperly). CarShield's call logs show that Pelican solicited known CarShield customers with specific call scripts and structured talking points tailored to switching *CarShield customers* to Pelican based upon their false and misleading statements. (Ex. 6, Canada Reply Decl, ¶¶19-22, 25-26.). Why would Pelican even mention CarShield in a call to someone where CarShield was not the topic?

Second, Pelican misrepresents the scope of Pelican's targeted telemarketing campaign. Pelican mischaracterizes CarShield's evidence as only five phone calls. (Response, p. 14.) Those were mere examples. There is evidence of far, far more than five calls.

CarShield's call logs show that there are *hundreds* of existing CarShield customers who received the targeted solicitation calls from Pelican. (Ex. 5, Hamilton Reply Decl., ¶19; Ex. 6, Canada Reply Decl., ¶7-11.) Another ten examples are provided here. (*Id.*; *see also* Ex. 6, Canada Reply Decl., ¶10, Exs. A-J.) And that's just the tip of the iceberg. Those hundreds of customers are only the CarShield customers *who actually called* CarShield once they received a Pelican solicitation call. (*Id*.) Many, many more CarShield customers received Pelican solicitation calls, but did not directly contact CarShield. (*Id*.) Without Pelican data, CarShield only knows about these hundreds. (*Id*.)

Pelican's cases deal with far different scenarios that dealt with isolated incidents of false

statements. In contrast here, Pelican used CarShield's confidential customer lists to launch a massive campaign to call all of them. Those are not isolated incidents, that's total coverage.

Pelican cannot launch a mass predatory telemarking campaign targeting known CarShield customers (from lists illegally obtained) with false statements about CarShield, try to flip those CarShield customers to Pelican, and try to write it off as not commercial advertising.

**c. Pelican's False Statements are Highly Material**

While Pelican concedes that its false statements regarding acceptance of CarShield plans at car dealers and repair shops are material, Pelican argues that who administers the claims is not. Pelican provides no support and is wrong in any event.

The relationship between the company marketing VSCs and the company administering the claims related to those VSCs is very important and highly material to a consumer's purchasing decision. (Ex. 5, Hamilton Reply Decl., ¶¶14-15; Ex. 7, Currier Reply Decl, ¶25.) CarShield's and AAS's in-house structure ensures that every claim under a CarShield-branded plan is reviewed, authorized, and paid by one of CarShield's trained administrators at AAS familiar with the terms of the contract. (*Id.*) That commitment to direct accountability has earned CarShield the trust of hundreds of thousands of customers. (*Id.*)

Additionally, the calls from CarShield customers who received Pelican's false and misleading sales calls is likewise proof of materiality. They would not have called CarShield if it didn't matter to them. And the same applies to Pelican. If claims administration is not material, why does Pelican say this very thing to CarShield customers in its telemarketing campaign? The answer is simple: because it is important and it does matter.

**2. CarShield is Highly Likely to Prevail on its Injurious False Claim under Missouri State Law**

Pelican's primary attack on CarShield's state-law injurious falsehood claim is that

Pelican's statements are not false. This is the same argument Pelican used against CarShield's Lanham Act claims, and results in the same outcome: they are false.

Pelican makes two other arguments. First, Pelican argues that it did not have knowledge of falsity or reckless disregard for the statements' truth or falsity because the statements were supported by publicly available information. (Response, p. 21.) Nonsense. Pelican knew CarShield's litigation with the FTC ended in a public settlement in September 2024—a year before Pelican started making its false sales calls. And Pelican knows its claims are contradicted by the public court filings in the FTC matter itself, which never alleged no repair shops or dealerships accept CarShield coverage. (Ex. 7, Currier Reply Decl. ¶22.)

Pelican knew that thousands of car dealers and repair shops accepted CarShield's VSC plans both before and after the FTC litigation. Pelican is a sophisticated participant in the VSC industry and a direct competitor of CarShield. The acceptance of CarShield coverage and the scope of CarShield's repair network are objective and verifiable facts readily ascertainable through ordinary competitive diligence, including CarShield's longstanding public marketing materials and the widely recognized and publicized Shield Repair Network. (*Id*.)

Pelican also contends that CarShield failed to establish pecuniary loss and causation. (Response, p. 21.) This ignores the evidentiary record. CarShield presented evidence of actual, concrete pecuniary loss, both lost customers and increased cost associated with disruption of its operations that required the company to devote significant internal resources to addressing misinformation from Pelican's false advertising. (Dkt. 8-1, ¶¶15-19.)

Ignoring this evidence, Pelican claims CarShield can't identify any specific lost customers or lost business dealings. CarShield will accept that challenge. CarShield has already identified over 15 specific instances where an existing, identifiable CarShield customer (i)

received a Pelican solicitation call in August 2025 or after, (ii) then called CarShield as a result of the Pelican call; and (iii) then cancelled or terminated his/her VSC with CarShield within a short time thereafter. (Ex. 5, Hamilton Reply Decl. ¶21.) These are actual lost CarShield customers, resulting in actual damage to CarShield, both in the form of existing and future VSCs, as well as referrals to others, such as family and friends. (*Id*.) Imagine how many more lost CarShield customers CarShield can't identify yet before discovery.

This is what happens when a competitor makes false, material statements about CarShield and its VSCs, and when customers were told to cancel their CarShield plans or led to believe that their coverage was no longer accepted at repair shops or car dealerships. (*Id*. at ¶22.)

### B. CarShield has Easily Demonstrated that it will Suffer Irreparable Harm Without an Injunction

Pelican admits that when CarShield demonstrates likelihood of success on the merits of its false advertising claim, Courts must presume irreparable harm. The Court can stop here.

But even setting the legal presumption aside, CarShield demonstrated irreparable harm. First, it presented extensive evidence of loss of reputation and goodwill. (*See* Dkt. 8-1, ¶¶17-19.) This is exactly what Pelican's cited cases require. Pelican even concedes that the "loss of intangible assets such as reputation and goodwill can constitute irreparable injury." (Response, p. 22.) And that's not speculation as suggested by Pelican, that's evidence from the sworn declaration of CarShield's CEO Nick Hamilton, who has held the position for over 20 years.

Second, while CarShield presented several examples of customers who actually took the time to call CarShield after receiving one of Pelican's false telemarketing solicitation calls, there are hundreds more. (Ex. 6, Canada Reply Decl. ¶7; *see also* Exs. A-J to Canada Reply Decl.) These calls are direct evidence that CarShield customers are concerned about their CarShield plans or coverage after listening to Pelican's false statements. (*Id*. at ¶¶22-23, 29-31.)

Third, Pelican criticizes Mr. Hamilton for failing to identify lost customers (Response, p. 22), but that's only one type of irreparable harm. Additionally, CarShield already identified above 15 lost CarShield customers. (Ex. 5, Hamilton Reply Decl., ¶21.) In addition to the actual business loss, irreparable harm results from unknown future loss, such as lost purchases of VSCs on different vehicles and referrals to others, such as family and friends. (*Id.* at ¶¶17-22.)

Pelican's citations to *MPAY* and *H&R Block* only support the need for a preliminary injunction. Those cases involved speculative and uncorroborated harm to goodwill and reputation. Here, CarShield provided concrete evidence of loss of goodwill and harm to reputation occurring on a nearly daily basis.

**C. The Balance of Harms Strongly Favors an Injunction**

Pelican's balance of harms argument boils down to wanting to continue making false statements. That is not a legitimate interest.

Pelican starts by criticizing CarShield for failing to file a proposed order. (Response, p. 23.) The Court's Local Rules do not require one. Nonetheless, this is semantics. CarShield included its requested relief: "The Court should issue a preliminary injunction directing Pelican to stop disseminating its false statements about CarShield while this action is pending." (Opening Brief, p. 24.) CarShield will additionally submit a proposed order to the Court.

It appears Pelican is already angling to word-smith around any specific statements. CarShield should not have to identify very specific statements that Pelican can then try to avoid based on technicalities. Pelican just needs to stop its lies and tell the truth.

Pelican also argues that it would have to avoid any mention of CarShield. (Response, p. 24.) That's not true, and that's not harm. That's competing fairly on your own merits. Pelican's argument reveals the underlying problem – Pelican wants to be able to perpetuate the falsehood that "repair facilities do not accept CarShield's plans." (Response, p. 24.) That's false. Pelican

cannot continue to make those types of statements.

And that does not even factor in Pelican's trade secret misappropriation, as there's no conceivable way Pelican lawfully acquired CarShield's private trade secret customer list!

Pelican should market its VSCs based on Pelican's own merits. Fair and square.

### D. The Public Interest Also Strongly Supports Granting an Injunction

Pelican concedes the most important point: "the public interest favors enjoining false statements." (Response, p. 24.) The rest of Pelican's public interest argument is moot. There is no case or set of circumstances that favor false statements.

While Pelican argues for "open competition" (Response, p. 24), that's not what Pelican really wants. Pelican doesn't want to compete on their own merits, it wants to continue to falsely attack CarShield, the largest and most successful VSC company in the U.S.

Pelican's cases don't change anything. While Pelican cites those cases for the proposition that the public interest weighs against an injunction, they all involve situations where there was no showing of likelihood of success and/or irreparable harm.

### E. There is No Justification for a Bond

Pelican claims that "Courts in this circuit have almost always required a bond before issuing a preliminary injunction." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (quoting Fed. R. Civ. P. 65(c)). But there are exceptions, and this case falls squarely within those exceptions because Pelican failed to present any evidence supporting any amount of a bond. Driving this point home, while Pelican argues against a low bond (Response, p. 25), just four pages earlier Pelican claims that they did not widely disseminate the false statements. Which is it?

## IV. CONCLUSION

CarShield requests that the Court grant CarShield's motion for preliminary injunction.

Dated: January 9, 2026

Respectfully submitted,

/s/Jeffrey H. Kass
Jeffrey H. Kass (E.D. Mo. #60672)
Dickinson Wright PLLC
1125 17th Street, Suite 550
Denver, CO 80202
Tel: (303) 723-8403
Fax: (844) 670-6009
jkass@dickinsonwright.com

and

/s/Alfred D. Carry
Alfred D. Carry (admitted *pro hac vice*)
Dickinson Wright PLLC
1825 I Street NW, Suite 900
Washington, DC 20006
Tel: (202) 466-5960
Fax: (844) 670-6009
acarry@dickinsonwright.com
DC Bar #1011877

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed in this case with the clerk of the court and served on this 9th day of January, 2026, through the Court's CM/ECF system, which will send notification of this filing to all counsel of record.

/s/Alfred D. Carry
Alfred D. Carry
*Counsel for Plaintiffs*