**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| NRRM, LLC d/b/a CARSHIELD, and AMERICAN AUTO SHIELD, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:25-cv-01566-HEA |
| PELICAN INVESTMENT HOLDINGS, LLC, NATIONAL ADMINISTRATIVE SERVICE CO., LLC, and SING FOR SERVICE, LLC d/b/a MEPCO, | ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

<u>**SECOND AMENDED COMPLAINT**</u>

Plaintiffs NRRM, LLC d/b/a CarShield ("CarShield") and American Auto Shield, LLC

("AAS") (collectively, "Plaintiffs"), for their Second Amended Complaint against Defendants

Pelican Investment Holdings, LLC ("Pelican"), National Administrative Service Co., LLC

("NASC"), and Sing for Service, LLC, d/b/a Mepco ("Mepco") (collectively, "Defendants"),

allege as follows:

**INTRODUCTION**

1.      This is an action for false advertising, unfair competition, tortious interference,

and trade secret misappropriation brought under the Lanham Act, the Defend Trade Secrets Act,

and state common law. Defendants—participants in the extended car warranty sector—use false

and deceptive telemarketing and misuse of Plaintiffs' trade secret information to steal customers

from Plaintiffs, interfere with Plaintiffs' contracts and business expectancies with their

customers, and induce consumers into purchasing Defendants' competing automotive warranty

products.

1

2.      An extended car warranty, technically referred to as a "vehicle service contract" or "protection plan," is a contractual product marketed as coverage for the cost of future repairs once a manufacturer's original warranty expires.

3.      For most companies in the industry, including Defendants, the process can be fragmented and involve multiple actors: (a) a seller or marketing company that promotes and sells coverage directly to consumers through telemarketing and over the phone; (b) a financing company that facilitates installment payments; and (c) a third-party administrator that manages claims and is responsible for honoring the coverage when mechanical issues arise.

4.      Because these functions are often performed by different entities, consumers reasonably rely on representations about who administers claims and whether coverage will be accepted by repair facilities when evaluating the reliability of a vehicle service contract and when deciding whether to purchase, retain, renew, or cancel coverage. A product marketed as being administered by an affiliated, in-family administrator signals accountability and reliability, whereas a product perceived as administered by an unrelated third party signals risk and uncertainty. As a result, statements about claims administration and repair-facility acceptance go to the core value of the product—whether the promised coverage will actually be honored when a vehicle breaks down—and misrepresentations on these topics are central, not ancillary, to purchasing and cancellation decisions.

5.      Plaintiffs operate differently. Unlike many competitors, CarShield does not outsource claims administration to unrelated or independent third parties. Instead, CarShield's vehicle service contracts are administered exclusively by its affiliated, in-family administrator, American Auto Shield, ensuring accountability and consistency in servicing customers. Although separate in corporate form, CarShield and AAS are commonly owned and present themselves as

closely affiliated entities with aligned roles in the administration of CarShield protection plans. They use shared branding and coordinated customer-facing communications, such that the consuming public do not encounter AAS as an independent or unrelated third party when seeking claims assistance. As a result, consumers who purchase CarShield protection plans understand that CarShield administers their claims and stands behind the coverage they purchase.

6.      Plaintiffs are well-recognized and reputable providers in this marketplace. CarShield has worked diligently since its founding to build brand recognition and consumer trust as a leading provider of vehicle service contracts and extended car warranty products. Its affiliate in-family administrator AAS handles claims administration and contract support for CarShield customers, reinforcing the reliability and transparency of Plaintiffs' offerings.

7.      Defendants' marketing practices stand in stark contrast and are anything but honest.

8.      Through its telemarketing operations, Pelican targets Plaintiffs' existing and prospective customers without their consent, while representing that it is contacting CarShield customers for purposes of transitioning or "switching" their existing coverage with CarShield to a Pelican plan. It's simple but devious: Defendants are trying to induce consumers they know to be CarShield customers to breach or otherwise terminate their vehicle service contracts with CarShield to sign up with Defendants.

9.      During these calls, Pelican makes specific, repeated, and demonstrably false statements intended to discredit Plaintiffs and induce customers to terminate or avoid doing business with CarShield. For example, Pelican falsely tells consumers that car dealers and repair shops no longer accept CarShield's plans and that CarShield does not administer its own claims. These statements are literally false as made. At a minimum, and independently, they are also

misleading in context because they convey false impressions to reasonable consumers regarding the validity, acceptance, and reliability of CarShield's coverage. These misrepresentations are material to consumers' purchasing and cancellation decisions and have caused concrete harm to Plaintiffs.

10.    By making these false and misleading statements as part of a coordinated nationwide telemarketing campaign directed to a substantial portion of the relevant purchasing public—sales calls that have resulted in hundreds of consumer complaints to Plaintiffs reflecting repeated and widespread dissemination far beyond the subset of consumers who reported Pelican's misconduct—Defendants unlawfully divert consumers from Plaintiffs to themselves, damage Plaintiffs' goodwill and credibility in the marketplace, and distort competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and applicable state law.

11.    Pelican has further exploited Plaintiffs by obtaining and using Plaintiffs' confidential customer lists—information not available to the public and only obtainable through unlawful means. Using this nonpublic data, Pelican has and continues to target existing CarShield customers and tortiously interfere with existing contracts, ongoing customer relationships, and business expectancies involving both CarShield and AAS.

12.    The Pelican contracts sold through these dishonest tactics are written for NASC. NASC is not a passive beneficiary of Pelican's conduct. Rather, NASC is the principal on whose behalf the contracts are marketed and sold, and it benefits directly from the volume of contracts generated through Pelican's unlawful sales efforts.

13.    NASC actively exercises control over Pelican's advertising and marketing of NASC's vehicle service contracts. It does so by, among other things, providing seller guides to Pelican and regularly reviewing and providing feedback on Pelican's advertising and marketing

materials, including telemarketing scripts and talking points. Accordingly, NASC knows of, profits from, and participates in Pelican's unlawful marketing practices. It further ratifies that conduct by continuing to authorize Pelican to sell NASC-administered contracts despite consumer complaints and public reports describing the deceptive tactics at issue. Indeed, on information and belief, NASC has responded directly to consumer complaints regarding Pelican's sales practices. By doing so, NASC shares responsibility for the false and misleading statements Pelican made to consumers in marketing its products.

14.     Mepco is the financial backbone of the scheme. It finances the contracts sold by Pelican on behalf of NASC. Far from being an arm's-length payment processor, Mepco materially participates in and enables the unlawful conduct by approving and processing consumer contracts, disbursing funds to Pelican and NASC, and continuing to fund those contracts while knowing, or at least having reason to know, that they were procured through Pelican's false and misleading sales practices. By providing the essential financial infrastructure that allows these contracts to exist and by knowingly profiting from falsely advertised sales, Mepco ratified and participated in the Lanham Act and state law violations alleged herein.

15.     Both CarShield and AAS are directly injured by Defendants' misconduct.

16.     CarShield loses customers and market share when its name and brand are falsely disparaged and consumers are diverted to Defendants through false statements and deception. CarShield's brand is further undermined every time Defendants misrepresent the quality, validity, acceptance, reliability, or administration of CarShield's protection plans.

17.     AAS, as CarShield's affiliated administrator, is also directly harmed. Defendants' false statements expressly and implicitly target AAS by claiming that CarShield does not administer its own claims, when in fact it does through its commonly owned affiliate AAS.

These lies erode consumer trust, damage AAS's reputation in the marketplace, interfere with Plaintiffs' customer relationships and business expectancies, and divert business away from Plaintiffs.

18.     Plaintiffs therefore bring this action to halt Defendants' unlawful conduct, to recover damages caused by their false and misleading advertising, as well as their misappropriation and misuse of Plaintiffs' trade secret information, and to protect both consumers and fair competitors from further harm.

## PARTIES

19.     Plaintiff NRRM, LLC is a Missouri limited liability company, doing business as CarShield, with its principal place of business located in St. Peters, Missouri—within this judicial district. CarShield sells vehicle protection plans.

20.     Plaintiff American Auto Shield, LLC is a Wyoming limited liability company with its principal place of business located in Lakewood, Colorado. Although legally a separate entity, AAS is part of the CarShield family of companies under common ownership, and AAS serves as the administrator of the vehicle protection plans sold by CarShield. In that role, AAS contracts with customers regarding covered repairs, processes repair claims, and oversees the delivery of benefits under CarShield's protection plans.

21.     Defendant Pelican Investment Holdings, LLC is a Delaware limited liability company, with its principal place of business located at 1300 Old Congress Road, West Palm Beach, FL 33409. Pelican holds itself out to the public under various trade names, including "Auto Service Department," "ASD," "Affordable Auto Protection," and "AAP." Pelican also conducts operations out of California from an address at 555 N. Park Drive, Suite 200, Santa Ana, CA 92705. Pelican conducts telemarketing and sales operations nationwide, including in

Missouri and within this judicial district, marketing and selling vehicle protection plans administered by NASC.

22.    Defendant National Administrative Service Co., LLC is an Ohio limited liability company with its principal place of business located at 5500 Frantz Road, Suite 120, Dublin, OH 43017. NASC administers vehicle protection plans marketed and sold by Pelican nationwide, including to consumers in Missouri and within this judicial district.

23.    Defendant Sing for Service, LLC is a Delaware limited liability company, doing business as "Mepco," "Mepco Payment Services," or "Mepco Finance Corporation," with its principal place of business located at 10 S. LaSalle Street, Suite 2310, Chicago, IL 60603. Mepco provides financing and payment-plan services for vehicle protection plans sold by Pelican and administered by NASC. In that role, Mepco approves and funds consumer installment contracts, disburses funds to Pelican and NASC, and finances transactions involving consumers located in Missouri and within this judicial district.

## JURISDICTION AND VENUE

24.    This Court has original jurisdiction over Plaintiffs' claims arising under the Lanham Act, 15 U.S.C. § 1125(a), and the Defend Trade Secrets Act, 18 U.S.C. § 1836, pursuant to 28 U.S.C. § 1331.

25.    This Court has supplemental jurisdiction over Plaintiffs' state-law claims for injurious falsehood, unfair competition, and tortious interference because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy. Supplemental jurisdiction is therefore proper pursuant to 28 U.S.C. § 1367.

26.     This Court has personal jurisdiction over Defendants because each Defendant, respectively, markets, sells, finances, or administers vehicle protection plans that compete

directly with Plaintiffs' plans in Missouri. In doing so, Defendants have purposefully directed false and misleading statements toward Missouri residents and have engaged in additional wrongful conduct—including the misuse of Plaintiffs' trade secret information—to target and solicit Missouri consumers. These acts constitute tortious conduct committed within Missouri that has caused, and continues to cause, injury to Plaintiffs and impacts or affects residents of Missouri. Defendants also derive substantial revenue from their business activities, including false advertising, in Missouri. Accordingly, this Court has personal jurisdiction over each Defendant pursuant to Missouri's long-arm statute, Mo. Rev. Stat. § 506.500, and consistent with due process.

27.     Exercising personal jurisdiction over Defendants comports with the Due Process Clause of the United States Constitution and does not offend traditional notions of fair play and substantial justice. Plaintiffs' claims arise out of and relate to Defendants' contacts with Missouri. Those contacts include false and misleading statements directed to Missouri residents and the misuse of Plaintiffs' confidential trade secret information to target consumers in Missouri. Defendants' conduct has caused and continues to cause injury to Plaintiffs in this forum.

28.     Venue is proper in the Eastern District of Missouri under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, because Defendants transact business in this district, and because Defendants' unlawful conduct caused injury to Plaintiffs in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.     CarShield's and American Auto Shield's Business

29.     CarShield has for many years served as the nation's leading seller of vehicle protection plans, protecting millions of vehicles and drivers throughout the United States.

30.    In connection with the sale and marketing of its protection plans sold throughout the United States, CarShield utilizes and owns a set of federally-registered trademarks, including the marks CARSHIELD and CARSHIELD.COM.[1]

31.    CarShield has continuously used its marks in interstate commerce since 2016 to advertise, market, and promote its vehicle protection plans.

32.    Through extensive and ongoing national advertising, marketing, and promotional campaign efforts, CarShield has generated substantial goodwill and consumer recognition in its brand and marks. The established and continued success of CarShield can hardly be overstated. Newsweek has repeatedly honored CarShield by naming it the "Most Trusted Brand" in the Extended Auto Warranty category based on consumer trust surveys, most recently in February 2024.

33.    CarShield has invested millions of dollars in marketing, advertising, and promoting its CarShield brand and marks in connection with the sale of vehicle service contracts to consumers. CarShield spends nearly $60 million per year in television advertising alone.

34.    CarShield has been featured across major television and radio outlets across the country, alongside well-known figures from the sports, entertainment, and media industries, including Allen Iverson, Ric Flair, Walker Buehler, Pete Alonso, Matt Vierling, Ice-T, Vivica Fox, Adrienne Janic, and Ernie Hudson. CarShield's advertisements have been featured on popular television networks including, without limitation, ABC, ESPN, Lifetime, CNN, Fox News, USA Today, CNBC, and the NFL Network.

---

[1] *See also* USPTO Reg. Nos. 87171040, 86843423, and 98599345, *available at* https://tmsearch.uspto.gov/search/search-information (last visited Jan. 2, 2026).

35.     CarShield has featured its CarShield brand and marks in tens of thousands of print, television, and radio advertisements to market its vehicle service contracts. CarShield also invests substantial amounts of money for its sponsorship of largely attended events, including sponsoring professional sports teams such as the St. Louis Cardinals, St. Louis Blues, sponsoring its own CarShield vehicle and driver on the NASCAR circuit, and having a CarShield sponsored stadium (i.e., CarShield Field) for minor league baseball just outside of St. Louis. CarShield is also advertising partners with the NFL's Jacksonville Jaguars, as well as with Major League Baseball (MLB), the National Hockey League (NHL), and the National Football League (NFL).

36.     By virtue of CarShield's extensive, continuous, and exclusive promotion and use of the CarShield marks to advertise, promote, distribute, and sell warranties, consumers across the United States recognize the CarShield marks and CarShield brand as belonging to CarShield, associate the services offered and sold under the CarShield marks exclusively with CarShield, and recognize and trust CarShield as the source of the warranties offered for sale and sold under the CarShield trademarks.

37.     As a result, CarShield has earned significant goodwill and valuable consumer trust among purchasers of vehicle protection plans and within the extended car warranty industry, based on widespread recognition of the CarShield brand by consumers and participants in the trade alike.

38.     Consumers are driven to purchase vehicle protection plans to ensure that costly future repairs that are covered will be honored when mechanical failures occur. Whether repair facilities will accept coverage and whether claims will be paid promptly and reliably are therefore central considerations in consumers' purchasing, renewal, and retention decisions and directly affect the perceived value of a company's vehicle protection plan.

39.     A key component of CarShield's value to consumers is the breadth and reliability of its repair-facility acceptance and partners. CarShield customers may obtain covered repairs at a nationwide network of independent repair facilities and car dealerships, including through Plaintiffs' Shield Repair Network, which consists of thousands of participating repair shops and service providers across the United States. The Shield Repair Network exists to streamline claims handling, facilitate direct payment to repair facilities, and ensure that Plaintiffs' customers are able to obtain covered repairs promptly and efficiently.

40.     In July 2024, the Federal Trade Commission ("FTC") filed an enforcement action against Plaintiffs in the Eastern District of Missouri, Case No. 4:24-cv-01055. The action concerned alleged misrepresentations in certain advertising about the scope of coverage provided by CarShield's vehicle service contracts, including representations about repair-facility choice, rental car benefits, and celebrity endorsements, arising under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Telemarketing Sales Rule, 16 C.F.R. Part 310. Plaintiffs explicitly did not admit these allegations and instead resolved the matter through a negotiated settlement.

41.     Since resolution of the FTC matter in September 2024, American Auto Shield—the administrator responsible for paying repair claims under CarShield's vehicle protection plans—has paid hundreds of millions of dollars in covered repair claims nationwide. During the same period, after resolution of the FTC matter, Plaintiffs' Shield Repair Network has continued to operate and include over 12,000 participating repair facilities with wide geographic reach across the country. These facts demonstrate that CarShield coverage continues to be honored and directly contradict Pelican's representations that CarShield coverage is no longer accepted by repair shops or dealerships.

**B.    CarShield's Confidential Customer Information**

42.    In the course of its business, CarShield has developed and maintains a body of confidential, nonpublic customer information that constitutes trade secrets within the meaning of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839, and is central to its operations and competitive position in the vehicle service contract market. This information includes, among other things, customer lists, customer names and contact information, insured vehicle information (including vehicle identification numbers), customer records, sales information, contract status and coverage details, contract and payment-plan information, and renewal and cancellation history (collectively, "CarShield's Confidential Customer Information").

43.    CarShield's Confidential Customer Information is not publicly available and is not readily ascertainable by competitors through proper means. It reflects CarShield's longstanding relationships with its customers and the ongoing performance of vehicle service contracts administered on their behalf.

44.    CarShield's Confidential Customer Information enables CarShield to service existing contracts, manage renewals, process claims, provide customer support, and maintain continuous relationships with customers over the life of their coverage. It also reflects the results of substantial investments in advertising, customer acquisition, claims servicing, payment-plan administration, customer support operations, and data management systems.

45.    CarShield takes reasonable and ongoing measures to maintain the secrecy of its Confidential Customer Information. Access to this information is limited to employees and service providers with a legitimate business need to know. For example, CarShield imposes confidentiality obligations on its employees and requires third parties—such as payment processing providers—to agree to contractual restrictions governing the use, retention, and

disclosure of CarShield's Confidential Customer Information. CarShield also employs technical, administrative, and internal policy-based controls designed to prevent unauthorized access, use, or disclosure.

46. CarShield's Confidential Customer Information has substantial commercial value because it reveals active, identifiable customer relationships in a highly competitive marketplace. Access to this information allows CarShield to conduct targeted marketing, manage customer relationships, pursue renewals, price products competitively, and retain customers. The information is developed over time and through significant effort. It is not static or incidental, but rather reflects the aggregation of millions of individual customer interactions and performance data across CarShield's nationwide customer base.

47. If misused or disclosed to competitors, CarShield's Confidential Customer Information can be exploited to harm CarShield's existing customer relationships and distort fair competition. A third party with access to this information could bypass the time, expense, and uncertainty associated with identifying, qualifying, and cultivating customers, target CarShield's customers directly, and interfere with ongoing contractual relationships. Unauthorized use of this information therefore poses a serious risk of immediate and lasting damage to CarShield's business, customer trust, and competitive standing.

C. **Pelican Knowingly Makes False Statements to Divert Customers from CarShield**

48. Pelican is a direct competitor of CarShield that markets and sells vehicle protection plans on behalf of NASC nationwide, primarily through outbound telemarketing.

49. Pelican conducts these sales through centralized call centers staffed by sales agents who are trained and coached and required to follow standardized call scripts, structured talking points, or rehearsed rebuttals to common consumer objections or questions. As alleged

more fully below, these scripts, talking points, or rebuttals are prepared with the approval and/or participation of NASC and pursuant to seller compliance guides and marketing standards issued by NASC, which exercises control over the advertising and marketing of NASC-administered vehicle service contracts. These materials are designed to control the substance and flow of Pelican's sales calls on NASC's behalf, convey predetermined messages regarding competitor products (including CarShield products), and induce consumers to cancel existing coverage and/or purchase the NASC vehicle protection plans marketed by Pelican.

50.     Beginning in or around at least September 2025, Pelican launched a telemarketing campaign using the standardized scripts, talking points, or rebuttals described above to place large volumes of outbound calls to consumers and CarShield customers across the United States, including Missouri, as part of a coordinated effort to disparage CarShield and divert business to Pelican-marketed plans.

51.     The campaign targeted, in substantial part, consumers who hold or have held active CarShield vehicle protection plans. Pelican confirmed, refined, or supplemented its targeting of these consumers through the use of CarShield's Confidential Customer Information, which Pelican possessed and used to fuel its sales calls and which was improperly supplied to Pelican by sources presently unknown but believed to become known through discovery.

52.     On information and belief, Pelican also made the same false and misleading statements at issue herein to consumers who were shopping for vehicle protection plans, including consumers whom Pelican believed to be considering or comparing CarShield products. In those calls, Pelican falsely disparaged CarShield's coverage, claims administration, and acceptance in order to influence purchasing decisions and divert prospective business away from Plaintiffs.

53.     In executing this campaign, Pelican's sales agents demonstrated access to CarShield's Confidential Customer Information by referencing and discussing details that included customer names and contact information, insured vehicle information, vehicle identification numbers, and the existence of an active CarShield protection plan, among other confidential customer-specific data protected by CarShield as trade secrets and not available to the public. Pelican's sales agents then used this information to frame calls as time-sensitive or urgent—suggesting that immediate action was required to avoid loss of coverage or inability to obtain repairs—thereby increasing the likelihood that consumers would cancel their existing CarShield coverage and switch to Pelican-marketed plans.

54.     Since Defendants' launch of this predatory campaign in or around September 2025, CarShield has received hundreds of inbound calls from its customers (customers under vehicle service contracts with CarShield) seeking customer service assistance and reporting confusion, concern, and alarm after receiving Pelican's sales calls. Consumers consistently reported that Pelican's representatives claimed to be calling CarShield customers regarding their existing coverage and urged them to switch plans immediately—warning that failure to do so could result in inability to obtain repairs—based on multiple false and misleading statements. And these are just Pelican's sales calls to CarShield's customers that CarShield knows about right now without the benefit of discovery. The number of actual false and misleading calls to CarShield's customers and other consumers is believed to be many multiples more than the hundreds of calls already discovered.

55.     The complaints CarShield received reflect a consistent and repeated pattern. Different consumers from different states described very similar or identical statements made by different Pelican sales agents, calling from spoofed numbers on different dates, all since at least

15

September 2025. These uniform reports demonstrate that Defendants' misrepresentations were disseminated broadly through Pelican's coordinated telemarketing campaign to CarShield's customers and other consumers in the market for vehicle protection plans, rather than being isolated or accidental remarks.

56.    During these calls, Pelican's sales agents made false and misleading statements of fact about CarShield to both existing CarShield customers and consumers shopping for vehicle protection plans, including but not limited to the following three misrepresentations designed to induce consumers to cancel their existing coverage and/or purchase Pelican's marketed plan instead:

a.    First, Pelican sales agents falsely told consumers that repair shops and car dealerships no longer accept CarShield coverage. This statement is literally false. As described above, CarShield coverage continues to be widely accepted, and AAS continues to pay hundreds of millions of dollars in repair clams to different repair shops and car dealers on behalf of CarShield customers all across the country. This statement is also misleading by necessary implication because it falsely suggests a widespread, industry-wide rejection of CarShield coverage, when in fact no such rejection exists.

b.    Second, Pelican sales agents falsely told consumers that CarShield uses unrelated third parties to administer and pay repair claims. That statement is also false or, at a minimum, misleading. CarShield's vehicle protection plans are administered by AAS, an affiliated, commonly owned, in-family administrator that performs claims handling for CarShield plans. Pelican's statements falsely imply that CarShield outsources claims administration to unrelated third parties, thereby wrongly suggesting diminished oversight, reliability, or accountability.

c.    Third, Pelican salespeople falsely told customers that, unlike CarShield, Pelican administers its own repair claims. That statement is false. NASC, not Pelican, administers the contracts sold by Pelican, and NASC is a separate and entirely independent company having no affiliation with Pelican.

d.    In making these misrepresentations, Pelican frequently invoked or alluded to the July 2024 regulatory action by the FTC to lend credibility to its sales pitch. In doing so, Pelican distorted the nature and scope of that proceeding by implying it supported claims that CarShield coverage was no longer accepted or that CarShield claims would not be honored—assertions the FTC did not allege and court did not find.

57.    Pelican's sales agents made these statements in a uniform manner pursuant to standardized scripts, talking points, and training materials that Pelican designed and implemented with NASC's oversight and control. Pelican repeated these statements across numerous sales calls as part of a coordinated telemarketing campaign to sell NASC-administered vehicle service contracts. The consistency of the language used by different sales agents, on different dates, and to different consumers—as reflected in the many customer complaints CarShield received—demonstrates that the challenged statements were not isolated or inadvertent, but part of a deliberate and systemic sales strategy.

58.    Whether literally false or misleading by necessary implication, Pelican's statements were material. Consumers purchase vehicle protection plans to obtain assurance that the cost of covered mechanical repairs will be paid when those repairs become necessary. Representations concerning whether claims will be paid, who administers claims, and whether repair facilities will accept coverage go to the core value of the product and are central to

consumers' decisions to purchase, retain, renew, or cancel vehicle protection plans. And Pelican's false and misleading statements were intended to, and did influence those decisions.

59.     Pelican knew that its representations about CarShield were false or misleading. Pelican is a sophisticated participant in the vehicle service contract industry and a direct competitor of CarShield. The acceptance of CarShield coverage and the scope of CarShield's repair network were objective and verifiable facts readily ascertainable through ordinary competitive diligence, including Plaintiffs' public marketing materials and the widely recognized and publicized Shield Repair Network. Pelican's allusions to the July 2024 FTC enforcement action as purported support for claims that CarShield coverage was no longer accepted by repair facilities were likewise false and misleading. Pelican knew this, as their claims are contradicted by the public court filings in the FTC matter itself, which did not allege that no repair shops or dealerships accept CarShield coverage. On information and belief, Pelican's knowledge of the falsity of its statements was further confirmed during the telemarketing campaign through consumer responses during live sales calls, post-sale cancellation or rescission requests, inbound consumer communications, and complaints received by or communicated to Pelican that reflected confusion and challenged the accuracy of Pelican's claims. Despite such notice, Pelican continued to disseminate the same misrepresentations, thereby demonstrating its deliberate, knowing, and willful misconduct.

60.     As a direct and proximate result of Pelican's false and misleading statements, consumers have cancelled or attempted to cancel CarShield coverage, questioned and doubted CarShield's coverage and ability to administer claims, purchased Pelican-marketed plans, or contacted Plaintiffs seeking refunds, clarification, or emergency assistance. Plaintiffs have

suffered lost customers, lost revenue, increased customer service and retention costs, reputational harm, and damage to goodwill.

**D.    NASC Exercised Control Over and Knowingly Participated in Pelican's Unlawful Marketing**

61.    Pelican sells vehicle protection plans administered by NASC pursuant to a written agreement between Pelican and NASC, which are separate and independent companies with no corporate affiliation.

62.    Pursuant to that agreement, Pelican acts as a marketer and seller of NASC-administered vehicle service contracts. The agreement also grants NASC authority and control over the advertising, marketing, and sale of NASC-administered plans, including the right to require compliance with applicable laws and, on information and belief, to review, approve, reject, modify, or impose constraints on the marketing statements and sales practices used by Pelican.

63.    Although Pelican drafts the advertising and telemarketing materials it uses to sell NASC-administered plans, NASC has input and control over those materials—including call scripts, sales talking points, and rebuttal points used by Pelican's sales agents—through its contractual rights and ongoing oversight.

64.    Since at least July 2024, and during the telemarketing campaign alleged herein beginning on at least September 2025, NASC has actively exercised this authority and control. NASC has done so by providing Pelican with seller compliance guides, marketing standards, and manuals. On information and belief, NASC has also reviewed, approved, and provided feedback on Pelican's advertising and marketing materials, including call scripts and sales talking points, and has communicated requirements regarding how NASC-administered plans should be marketed to consumers.

65.     Through its review, feedback, and oversight of Pelican's marketing materials and sales practices, NASC had actual knowledge, or at a minimum constructive knowledge, of the substance of the false and misleading representations Pelican made to consumers regarding competitor products, including CarShield's vehicle protection plans, and the purported superiority of NASC-administered plans.

66.     NASC was also aware of the FTC enforcement action against Plaintiffs filed in July 2024 and understood the nature and scope of that proceeding. As an experienced participant in the vehicle service contract industry, NASC knew that the FTC's allegations concerned purported overstatements in certain advertising regarding repair-facility choice, rental car benefits, and celebrity endorsements—not that CarShield coverage was no longer accepted by repair facilities or that CarShield claims were not honored. NASC further knew and continues to know that Plaintiffs maintain a nationwide repair network and that CarShield coverage continues to be accepted by repair shops and car dealerships across the country. Despite this knowledge, NASC allowed Pelican to invoke or allude to the FTC action in a misleading manner to disparage CarShield and promote NASC-administered plans.

67.     Pelican's unlawful calling and sales tactics were not isolated or concealed. They were documented in consumer complaints and online reviews describing Pelican's deceptive sales calls and false statements at issue herein, including complaints specifically referencing the NASC-administered contracts sold by Pelican.

68.     NASC was aware of these complaints and the nature of Pelican's misrepresentations. On information and belief, NASC received consumer complaints directly, reviewed complaints forwarded by third-party platforms such as the Better Business Bureau, and

received inquiries and complaints from consumers concerning NASC-administered plans sold through Pelican.

69.     Despite this knowledge and its contractual authority to intervene, NASC did not take meaningful corrective action, did not require Pelican to modify or withdraw the scripts, talking points, rebuttal materials, or sales practices used in sales calls, and continued to authorize Pelican to market and sell NASC-administered plans using the same unlawful methods.

70.     By continuing to accept the financial benefits of sales generated through Pelican's false and misleading advertising, while exercising control over Pelican's marketing and sales practices and failing to stop known misconduct, NASC knowingly participated in, materially contributed to, ratified, and is liable for Pelican's false advertising and unfair competition.

**E.     Mepco Knowingly Finances Contracts Procured Through Pelican's Unlawful Sales Tactics**

71.     Mepco provides financing for the vehicle protection plans sold by Pelican and administered by NASC by approving, processing, and funding consumer installment payment plans.

72.     Mepco's financing is an essential component of Pelican's sales model. After Pelican secures a sale through its outbound telemarketing, Mepco processes the consumer's payment application, funds the contract, disburses proceeds to Pelican and NASC, and collects its own fees and interest. Without Mepco's approval and funding, Pelican's sales could not be consummated.

73.     Mepco is not a neutral or passive payment processor capable of claiming ignorance. Since at least September 2025, Mepco has had actual knowledge, or at a minimum reason to know, that Pelican was procuring contracts through false and misleading sales tactics directed at CarShield customers and prospective purchasers.

74.    As the payment processor for Pelican, Mepco had visibility into Pelican's day-to-day business activities and objective indicators of sales conduct, including sales volume, cancellation rates, chargebacks, refund activity, and consumer complaints—metrics that, on information and belief, signaled deceptive and unlawful sales conduct in the vehicle service contract industry and that, since at least September 2025, placed Mepco on notice of Pelican's misconduct.

75.    Despite this knowledge, Mepco continued to approve, fund, and profit from Pelican-marketed contracts procured through false and misleading sales tactics.

76.    Mepco's willingness to support and align itself with conduct harmful to Plaintiffs was further informed by the breakdown of Mepco's prior business relationship with CarShield. For years, Mepco provided payment plan provider services for CarShield. That relationship deteriorated and ultimately culminated in Mepco filing suit against CarShield in May 2024 in the Northern District of Illinois, Case No. 1:24-cv-03625, seeking several million dollars in alleged amounts arising from Mepco's prior funding of CarShield's operations.

77.    Against that backdrop, Mepco knowingly chose to align itself with Pelican—CarShield's competitor—and to finance sales obtained through tactics that disparaged CarShield, induced customers to cancel existing CarShield coverage, and diverted business away from Plaintiffs.

78.    Without Mepco's continued financing, Pelican and NASC could not sustain or expand the deceptive sales scheme alleged herein. By knowingly providing the essential financial infrastructure that allowed those sales to occur, while profiting from each transaction, Mepco materially contributed to, enabled, and ratified the unlawful conduct.

79.     Mepco's conduct was knowing and willful and undertaken with conscious disregard for the rights of Plaintiffs and consumers, rendering Mepco liable under the Lanham Act and applicable state law.

**F.      Trade Secret Misappropriation by Pelican**

80.     Pelican possessed and used CarShield's Confidential Customer Information in connection with a coordinated telemarketing campaign directed at CarShield customers.

81.     CarShield knows this because there are no publicly available sources of information that provide a list of CarShield's customers.

82.     Pelican obtained CarShield's Confidential Customer Information from sources presently unknown to Plaintiffs but which CarShield believes will become known through discovery.

83.     Using that data, Pelican initiated its outreach and telemarketing campaign directed to CarShield customers.

84.     Pelican's sales agents in fact contacted CarShield customers. As reflected in calls with customers, Pelican's sales agents represented to consumers that they were specifically contacting existing CarShield customers and were calling about their existing CarShield coverage. Pelican reached consumers who held active CarShield coverage.

85.     Pelican's ability to identify and contact CarShield customers is consistent with access to and use of nonpublic, confidential information not generally known or commercially available in the vehicle service contract industry. To the extent Pelican relied on other lead sources to identify consumers to call, Pelican's sales agents nevertheless used CarShield's Confidential Customer Information during their calls to confirm that identification or give their sales pitch the appearance of legitimacy by referencing CarShield-specific, nonpublic customer details.

23

86.     During these sales calls, Pelican's sales agents at times disclosed highly specific, nonpublic CarShield Confidential Customer Information, including customers' existing coverage status, vehicle details, and contract-related or protection-plan payment information.

87.     Pelican sales agents also told CarShield customers that they were being contacted because they appeared on a "list." Some CarShield customers then told CarShield that they were surprised, confused, and concerned during the Pelican calls upon hearing the scope and extent of the sensitive information Pelican appeared to possess—reactions that further underscore Pelican's access to and use of confidential, customer-level information beyond what could be inferred, guessed, or derived from generalized marketing data.

88.     Pelican leveraged that purported "list"-based status and confidential customer-specific information to shape its sales calls as requiring prompt attention, implying that consumers faced imminent consequences relating to their existing CarShield coverage or ability to obtain repairs unless they acted quickly. Pelican did so to increase the likelihood that CarShield customers would cancel or not renew their existing coverage and purchase a Pelican-marketed plan instead.

89.     Pelican at all times knew or had reason to know that the CarShield Confidential Customer Information it received, possessed, and used was obtained through improper means, as Pelican understands that such customer-specific information of this nature is not public or commercially available in the vehicle service contract industry and that such information obtains its value from not being public or commercially available. The information was confidential, nonpublic, customer-specific, and included sensitive details, such as active coverage status and vehicle information, that CarShield closely guards and that could only have originated from CarShield or a prior confidential commercial relationship with CarShield.

90.     Pelican used CarShield's Confidential Customer Information to place or supplement its targeted telemarketing calls to CarShield customers for the purpose of inducing them to cancel or terminate their CarShield coverage and purchase Pelican-marketed vehicle service contracts through deceptive and misleading sales practices.

91.     Pelican's misappropriation and use of CarShield's trade secrets was willful and malicious.

**G.     Damages, Irreparable Harm, and Causation**

92.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer damages.

93.     Pelican's false and misleading statements were not vague exaggerations or nonactionable puffery. They were specific, verifiable falsehoods about the core functionality and reliability of CarShield's vehicle protection plans, made for the purpose of diverting customers through deception.

94.     Such false statements are especially harmful in the vehicle service contract industry, where consumers frequently make purchasing and cancellation decisions in real time, often over the phone during sales calls, based on representations regarding coverage, claims handling, claims administration, and repair facility acceptance. False claims that a plan is unusable, unaccepted, or unreliable cause consumers to abandon existing coverage or forego purchasing altogether, and the resulting loss of trust and goodwill, and reputation damage, spreads quickly and is difficult to undo.

95.     Plaintiffs have built their business on the promise that their vehicle service contracts are honored where accepted and that claims are handled by an affiliated, in-family administrator rather than a totally unrelated third party. Defendants' false statements directly

25

undermine that value proposition by misleading consumers at the point of sale, resulting in lost business, consumer confusion, and reputational harm.

96.    The effects of Defendants' misconduct have already been and continue to be felt. Since the launch of Pelican's telemarketing campaign, CarShield's customer-service department has received hundreds of calls and inquiries from confused and alarmed consumers reporting that they were specifically contacted by Pelican's sales agents—often using spoofed numbers—and told that those Pelican sales agents told them the false and misleading statements that CarShield coverage was no longer accepted and/or could not be used for repairs.

97.    Defendants' conduct has forced Plaintiffs to divert substantial resources from ordinary business operations to respond to consumer confusion, investigate complaints, and attempt to retain customers targeted by Defendants' false statements. More significantly, Defendants have inflicted lasting harm to Plaintiffs' goodwill, reputation, and customer relationships—harms that cannot be fully quantified or remedied through monetary damages alone.

98.    Defendants' false advertising and misuse of confidential information have also caused and continue to cause irreparable harm to Plaintiffs' goodwill, reputation, and customer relationships.

99.    Defendants' unlawful conduct is ongoing and threatens continued and compounding harm to Plaintiffs unless enjoined by the Court.

100.    This action involves the very forms of misconduct Congress sought to prevent through passage of the Lanham Act and the Defend Trade Secrets Act—false advertising in interstate commerce and the misuse of confidential information—so as to ensure that competition turns on the merits of products and services rather than deceptive statements about competitors.

**H.    Defendants' Conduct Was Willful**

101.    Defendants' actions were deliberate, knowing, willful, and calculated to mislead consumers and to unfairly compete with CarShield and AAS. Defendants acted with knowledge of the falsity of their statements.

102.    Defendants continued their unlawful conduct despite consumer complaints and notice of confusion and harm.

103.    Defendants' concerted conduct and scheme has caused and continues to cause substantial harm to Plaintiffs, their sales, their goodwill, and their business reputation, and entitles Plaintiffs to injunctive relief, enhanced damages, and all other relief available under federal and state law.

**CAUSES OF ACTION**

**<u>COUNT 1</u>**

**False Advertising in Violation of Section 43(a) of the Lanham Act**
(CarShield v. Pelican)

104.    CarShield restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

105.    Pelican's conduct, as described herein, constitutes false and misleading representations of fact in commercial advertising or promotion in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

106.    As alleged above, Pelican repeatedly and systematically represented to consumers (including specifically and directly CarShield customers), among other things, that: (a) repair shops and car dealers no longer accept CarShield coverage; (b) CarShield relies on unrelated third parties to administer and pay repair claims; and (c) Pelican, unlike CarShield, administers its own repair claims.

107.    Each of these statements is literally false or false and misleading by necessary implication. These statements concerned objective and verifiable facts about CarShield's products and services and were material to consumers' purchasing and cancellation decisions and likely to deceive reasonable consumers by diverting customers away from CarShield and toward Pelican.

108.    Pelican disseminated these false statements widely through a coordinated telemarketing campaign using standardized scripts, talking points, and marketing materials, constituting "commercial advertising or promotion" directed to a substantial segment of the relevant purchasing public, including specifically targeting existing and/or former CarShield customers.

109.    Pelican made these statements intentionally and with knowledge of their falsity, or at a minimum with reckless disregard for their truth or falsity, for the purpose of diverting customers away from CarShield and toward Pelican-marketed plans.

110.    Pelican's conduct has forced CarShield to expend substantial resources responding to consumer confusion, investigating complaints, and attempting to retain customers targeted by Pelican's false statements.

111.    Pelican's false advertising has caused and continues to cause CarShield actual and irreparable injury, including lost sales, diverted business, damage to goodwill and reputation, and diminution of the value of its marks.

112.    CarShield is entitled to injunctive relief, disgorgement of Pelican's profits, compensatory damages, enhanced damages for willful misconduct, costs, and attorneys' fees pursuant to 15 U.S.C. § 1117.

## COUNT 2

### Injurious Falsehood under Missouri Law
(CarShield v. Pelican)

113.    CarShield restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

114.    Beginning in or around September 2025 and continuing thereafter, Pelican published false and disparaging statements of fact about CarShield during sales calls in a telemarketing campaign placed to consumers nationwide, including consumers in Missouri and CarShield's current and/or former customers across the country.

115.    As described in detail above, Pelican's sales agents falsely stated to consumers, among other things, that repair shops and car dealerships no longer accept CarShield coverage, that CarShield does not administer its own claims and instead relies on unrelated third parties, and that CarShield's plans were inferior or unreliable as compared to Pelican-marketed plans.

116.    Pelican published these statements knowingly or with reckless disregard for their falsity by making the same statements repeatedly through calls using standardized scripts, talking points, verbal training, and rehearsed rebuttals, despite Pelican's knowledge that CarShield coverage continued to be accepted nationwide and that CarShield's claims were administered by its affiliated administrator, AAS.

117.    Pelican made these statements for the specific purpose of causing pecuniary harm to CarShield by inducing consumers (including known CarShield customers and/or former customers) to cancel existing CarShield coverage, discouraging prospective customers from purchasing CarShield plans, and diverting those customers to Pelican-marketed vehicle protection plans instead.

29

118.    Pelican's statements directly impugned the quality, acceptance, and reliability of CarShield's vehicle protection plans, falsely portraying them as unusable or no longer accepted by repair facilities, and were calculated to interfere with CarShield's existing and prospective business relationships.

119.    Pelican also sought to bolster its false sales pitch by alluding to, or referencing the existence of, an FTC enforcement action against Plaintiffs in mid-2024, using regulatory scrutiny as a scare tactic to pressure consumers into switching coverage. Pelican's sales agents did not accurately describe the substance of that proceeding. Rather, they leveraged its mere existence to suggest—falsely—that CarShield coverage had become unreliable or was no longer accepted by repair facilities.

120.    Those statements were unfounded. The FTC action addressed alleged overstatements in advertising regarding features such as repair-facility choice, rental car benefits, and celebrity endorsements. It did not allege that CarShield was no longer accepted by repair shops or dealerships, and it certainly did not allege or suggest that CarShield coverage became unacceptable as a result of the FTC action. Pelican, a sophisticated and experienced participant in the vehicle service contract industry and a direct competitor of CarShield knew and understood this distinction, and Pelican knew that the FTC action did not support the claims it was making to consumers.

121.    CarShield's acceptance at repair facilities, including repair facilities in its Shield Repair Network, is publicly marketed, widely advertised, and readily ascertainable through CarShield's consumer-facing materials and industry presence. As a competitor actively selling vehicle protection plans in the same marketplace, Pelican was well aware that CarShield maintains a broad and functioning repair network for its customers. Pelican nevertheless

exploited consumer confusion by mischaracterizing the FTC matter deliberately to manufacture urgency, undermine confidence in CarShield, and induce cancellations for Pelican's own financial gain.

122.    Pelican acted with actual malice, as evidenced by its systematic and repeated dissemination of the same false statements, its use of time-sensitive pressure tactics to encourage cancellations, its mischaracterization of regulatory scrutiny to lend credibility to its claims, and its continuation of this conduct despite consumer confusion and complaints.

123.    As a direct and proximate result of Pelican's injurious falsehoods, CarShield has suffered special damages, including but not limited to: the loss of customers who cancelled or attempted to cancel CarShield coverage following Pelican's calls; lost revenues and renewal income associated with those cancellations; increased customer service and retention costs incurred in responding to Pelican's false statements; and measurable diminution in goodwill and customer trust, as reflected in consumer complaints and cancellation activity, and reputational harm.

124.    Pelican has been unjustly enriched through profits obtained from sales procured by means of its false and disparaging statements about CarShield, and those profits should be disgorged.

## COUNT 3

### Unfair Competition under Missouri Law
(CarShield v. Pelican)

125.    CarShield restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

126.     Pelican engaged in unfair competition by employing deceptive and improper means to divert customers and business from CarShield in connection with the marketing and sale of competing vehicle protection plans.

127.     As alleged above, Pelican's unfair competitive conduct included, among other things, a coordinated telemarketing campaign disseminating false statements about CarShield, the deliberate distortion of an FTC enforcement action to sow doubt among consumers, false claims concerning CarShield's plan acceptance and claims administration, and the inducement of consumers to cancel existing CarShield coverage through deceptive and misleading sales practices.

128.     Pelican knew the statements at issue in its sales pitches were false and material when made, and yet Pelican made them anyway with extreme malice in order to divert and steal customers from CarShield. Pelican also knew it was making the statements directly to existing and/or former CarShield customers.

129.     Pelican's conduct was unethical, deceptive, and contrary to honest commercial practices, and was undertaken not to compete on the merits, but to unfairly interfere with CarShield's customer relationships and goodwill, and to harm CarShield's reputation in the industry.

130.     As a direct and proximate result of Pelican's unfair competition, CarShield has suffered substantial harm, including but not limited to: the loss of customers who cancelled or attempted to cancel CarShield coverage following Pelican's calls; lost revenues and renewal income associated with those cancellations; increased customer service and retention costs incurred in responding to Pelican's false statements; reputational injury; and measurable

diminution in goodwill and customer trust, as reflected in consumer complaints and cancellation activity.

## COUNT 4

### Tortious Interference with Business Expectancy
(CarShield and AAS v. Pelican)

131.    CarShield and American Auto Shield restate and incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

132.    Plaintiffs maintain valid and ongoing contractual business relationships with customers who hold active CarShield vehicle protection plans administered by AAS. These relationships frequently span multiple years and involve recurring monthly payments, ongoing claims administration, customer support obligations, and contractual renewal rights. They give rise to a reasonable and valid business expectancy that CarShield customers will continue performing under their contracts, pay their premiums, submit claims for covered repairs, and renew or extend coverage absent unlawful interference.

133.    These customer relationships and business expectancies are neither speculative nor abstract. They arise from existing customers with active, identifiable contracts, known account histories, scheduled payments, renewal terms, and ongoing performance obligations. Plaintiffs' customer relationships and expectancies include, at a minimum: (a) the hundreds of CarShield customers (identifiable by their unique contract/account numbers) who contacted Plaintiffs to report Pelican's sales calls, confusion, and pressure to cancel coverage; and (b) additional CarShield customers who were targeted by Pelican's sales agents but did not report Pelican's misconduct to Plaintiffs. The identities and scope of the latter group of customers are uniquely within Pelican's possession, as Pelican knows which CarShield customers it contacted

and attempted to induce to switch coverage to a Pelican-marketed plan based on its false and misleading statements, and their identities will be confirmed through discovery.

134.    Pelican knew of Plaintiffs' existing relationships and business expectancies. Pelican's sales agents expressly referenced customers' active CarShield coverage, during sales calls, demonstrating Pelican's knowledge of the ongoing contractual relationships it sought to disrupt.

135.    Pelican intentionally interfered with CarShield's relationships and business expectancies by, among other things, targeting existing CarShield customers and inducing them to terminate their coverage. During sales calls, Pelican's agents instructed known CarShield customers on how to cancel their CarShield/AAS contracts and, in many instances, offered to walk customers through the cancellation process step by step.

136.    Pelican's interference was not justified competition. It was accomplished through improper means, including the systematic use of false and misleading statements regarding CarShield's coverage, claims administration, and acceptance by repair facilities; the mischaracterization of regulatory scrutiny; the misuse of Plaintiffs' Confidential Customer Information; and the deployment of deceptive, scripted sales tactics designed to create false urgency and undermine consumer confidence in Plaintiffs' products.

137.    Pelican's interference has already manifested in concrete harm. Since at least September 2025, Plaintiffs have received hundreds of inbound calls from CarShield customers reporting confusion, alarm, and pressure to cancel following Pelican's sales calls. These reports constitute direct evidence that Pelican's conduct disrupted existing customer relationships and caused immediate operational harm, including increased customer-service demands, retraining costs, and retention efforts.

138.    In addition to customers who contacted Plaintiffs, Pelican interfered with the business expectancies of other CarShield customers who did not report Pelican's conduct but were nonetheless targeted with the same false statements and cancellation inducements. The identities and scope of these customers are uniquely within Pelican's possession and will be confirmed through discovery.

139.    By employing deception and misinformation rather than competing on the merits of its own products, Pelican exceeded the bounds of lawful competition and intentionally caused customers to abandon existing relationships with Plaintiffs based on Pelican's false and misleading statements at issue herein.

140.    As a direct and proximate result of Pelican's tortious interference, Plaintiffs have suffered and will continue to suffer damages, including lost contracts, lost revenue, increased customer-service and retention costs, disruption of ongoing customer relationships, and loss of expected renewals and future business.

## COUNT 5

**False Advertising in Violation of Section 43(a) of the Lanham Act**
**Vicarious Liability, Agency, Apparent Authority, Ratification**
(CarShield v. NASC)

141.    CarShield restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

142.    Pelican marketed and sold vehicle service contracts administered by NASC pursuant to a written agreement under which Pelican acted as NASC's authorized marketer and seller.

143.    Under that agreement, NASC retained and exercised authority and control over the advertising, marketing, and sale of NASC-administered vehicle service contracts, including the right to require compliance with applicable laws and to review, approve, reject, modify, or

impose constraints on Pelican's marketing statements, call scripts, sales talking points, rebuttal materials, and sales practices.

144.    As alleged above, Pelican made the false and misleading statements at issue while acting within the scope of that authority and in the course of marketing NASC-administered plans, on NASC's behalf.

145.    NASC had actual knowledge, or at a minimum constructive knowledge, of Pelican's false advertising and deceptive sales practices through multiple channels, including its review and oversight of Pelican's marketing materials, its receipt and review of consumer complaints and inquiries concerning NASC-administered contracts, and publicly available complaints and reports describing Pelican's sales tactics.

146.    Despite this knowledge and its contractual authority to intervene, NASC failed to take meaningful corrective action, failed to require Pelican to withdraw or modify its scripts and sales practices, and continued to authorize Pelican to market and sell NASC-administered plans using the same false and misleading statements.

147.    NASC further ratified Pelican's conduct by continuing to accept the financial benefits of sales generated through Pelican's false advertising, by honoring and administering contracts procured through that conduct, and by issuing NASC contracts directly to consumers following Pelican's sales calls.

148.    NASC's actions provided Pelican with apparent authority to engage in the challenged conduct. A reasonable consumer would believe that Pelican's sales practices were authorized by NASC, particularly where NASC subsequently issued the contract, communicated directly with the consumer, and administered the plan sold through Pelican's representations.

149.    Independently, NASC is contributorily liable under the Lanham Act because it knowingly participated in, facilitated, and materially contributed to Pelican's false advertising by supplying the vehicle service contracts, exercising control over the marketing of those contracts, and continuing to provide the means for Pelican's deceptive sales practices despite knowledge of the misconduct.

150.    As a direct and proximate result of NASC's agency relationship with Pelican, its ratification of Pelican's conduct, and its material contribution to the false advertising scheme, NASC is liable for violations of Section 43(a) of the Lanham Act.

151.    CarShield has suffered and continues to suffer actual and irreparable injury as a result of NASC's conduct, including lost sales, diverted customers, damage to goodwill and reputation, and diminished value of its marks.

152.    CarShield is entitled to injunctive relief, disgorgement of NASC's profits attributable to the false advertising, compensatory damages, enhanced damages for willful misconduct, costs, and attorneys' fees pursuant to 15 U.S.C. § 1117.

## **COUNT 6**

**Injurious Falsehood under Missouri Law**
**Vicarious Liability, Agency, Apparent Authority, Ratification**
(CarShield v. NASC)

153.    CarShield restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

154.    Pelican published false and disparaging statements of fact about CarShield in the course of marketing and selling NASC-administered vehicle service contracts, including statements falsely asserting that CarShield coverage was no longer accepted by repair facilities, that CarShield did not administer its own claims, and that CarShield's plans were unreliable or inferior.

155.    At all relevant times, Pelican acted as NASC's authorized marketer and seller of NASC-administered plans and made the false statements described herein within the scope of that agency and for NASC's direct financial benefit.

156.    As alleged above, NASC exercised control over Pelican's marketing and sales practices, had actual or constructive knowledge of Pelican's false statements through its oversight of marketing materials and receipt of consumer complaints, and nonetheless failed to take corrective action.

157.    NASC ratified Pelican's injurious falsehoods by continuing to authorize Pelican to market NASC-administered plans using the same false statements, by honoring and administering contracts procured through those statements, and by retaining the financial benefits derived from sales obtained through the disparagement of CarShield, including knowingly to CarShield's current and/or existing customers.

158.    Through Pelican's agency, apparent authority, and NASC's ratification of Pelican's conduct, NASC is vicariously liable under Missouri law for Pelican's publication of false and disparaging statements about CarShield.

159.    As a direct and proximate result of Pelican's injurious falsehoods, for which NASC is vicariously liable, CarShield has suffered special damages, including lost customers, lost revenue, increased customer-retention costs, and harm to its goodwill and business reputation, in amounts to be proven at trial.

### COUNT 7

**Unfair Competition under Missouri Law**
**Vicarious Liability, Agency, Apparent Authority, Ratification**
(CarShield v. NASC)

160.    CarShield restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

161.    Pelican engaged in unfair competition by employing deceptive and improper means to divert customers from CarShield in connection with the marketing and sale of NASC-administered vehicle service contracts.

162.    As alleged above, Pelican's unfair competitive conduct included, among other things, the systematic dissemination of false statements about CarShield through scripted telemarketing campaigns, the mischaracterization of regulatory scrutiny to undermine consumer confidence, and the inducement of consumers, including known CarShield customers with active contracts with CarShield, to cancel existing CarShield coverage through misinformation and false urgency, among other things.

163.    At all relevant times, Pelican acted as NASC's authorized marketer and seller of NASC-administered plans and engaged in the unfair competitive conduct described herein within the scope of that agency and for NASC's direct financial benefit.

164.    NASC exercised control over Pelican's marketing and sales practices, had actual or constructive knowledge of Pelican's unfair competitive conduct, and nonetheless failed to take meaningful corrective action.

165.    NASC ratified and affirmed Pelican's unfair competition by continuing to authorize Pelican to market NASC-administered plans using the same deceptive practices, by honoring and administering contracts procured through those practices, and by retaining the financial benefits derived from the diversion of customers from CarShield.

166.    Through Pelican's agency, apparent authority, and NASC's ratification of the conduct described herein, NASC is vicariously liable under Missouri law for Pelican's unfair competition.

167.    As a direct and proximate result of Pelican's unfair competitive practices, for which NASC is vicariously liable, CarShield has suffered damages, including diversion of customers, lost revenue, increased customer-retention costs, and injury to goodwill and reputation, in amounts to be proven at trial.

## COUNT 8

**False Advertising in Violation of Section 43(a) of the Lanham Act**
**Vicarious Liability, Agency, Apparent Authority, Ratification**
(CarShield v. Mepco)

168.    CarShield restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

169.    Pelican engaged in false advertising in violation of Section 43(a) of the Lanham Act by disseminating false and misleading statements about CarShield in connection with the marketing and sale of vehicle service contracts.

170.    Mepco is liable under the Lanham Act for Pelican's false advertising because Mepco knowingly participated in, facilitated, and materially contributed to that conduct, and continued to provide the means by which the false advertising was carried out.

171.    Mepco entered into a written Dealer Agreement with Pelican pursuant to which Mepco provided financing for vehicle service contracts sold by Pelican and administered by NASC.

172.    Under that agreement, Mepco retained sole discretion to approve or reject individual consumer payment plans and the authority to terminate financing or the entire relationship at any time, for any reason, without liability. The agreement further required Pelican to comply with all applicable federal and state laws, including consumer protection and false advertising laws, as a condition of continued financing.

173.    Mepco's financing was an essential component of Pelican's sales model. Pelican's sales could not be consummated without Mepco's approval and funding, and Mepco earned fees and interest on each contract generated through Pelican's sales calls.

174.    As alleged above, Mepco was not a neutral or passive payment processor. Through its discretionary control over funding and access to sales metrics and customer-level performance data—including sales volume, cancellation rates, and consumer complaints—Mepco had actual knowledge or, at a minimum, reason to know that Pelican was engaging in false and misleading advertising directed at CarShield customers and prospective purchasers.

175.    Despite this knowledge and despite its contractual authority to reject funding, suspend financing, or terminate its relationship with Pelican, Mepco continued to approve, fund, and profit from contracts procured through Pelican's false advertising.

176.    By continuing to provide the indispensable financial infrastructure that allowed Pelican's deceptive telemarketing campaign to function and persist, Mepco materially contributed to, induced, and enabled the dissemination of the false advertising, satisfying the standard for contributory liability under Section 43(a) of the Lanham Act.

177.    Mepco further ratified Pelican's false advertising by knowingly retaining the financial benefits derived from contracts obtained through deception and by continuing to fund those contracts after acquiring knowledge of the unlawful conduct.

178.    As a direct and proximate result of Pelican's false advertising, to which Mepco knowingly contributed and which it ratified, CarShield has suffered actual and irreparable injury as previously alleged, in the amounts to be proven at trial.

179.    CarShield is entitled to injunctive relief, disgorgement of Mepco's profits attributable to the false advertising, compensatory damages, enhanced damages for willful misconduct, costs, and attorneys' fees pursuant to 15 U.S.C. § 1117.

## COUNT 9

**Injurious Falsehood under Missouri Law**
**Vicarious Liability, Agency, Apparent Authority, Ratification**
(CarShield v. Mepco)

180.    CarShield restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

181.    As alleged above, Pelican published false and disparaging statements of fact about CarShield to consumers, including false statements that CarShield coverage was no longer accepted by repair facilities, that CarShield did not administer its own claims, and that CarShield plans were unreliable or inferior.

182.    Mepco is liable for Pelican's injurious falsehoods because Mepco knowingly participated in, facilitated, and ratified the publication of those false statements by continuing to finance and profit from contracts procured through that conduct after acquiring actual knowledge or, at a minimum, reason to know of the falsehoods.

183.    Since at least September 2025, Mepco knew or had reason to know that Pelican was disseminating false statements about CarShield through outbound telemarketing. Mepco's knowledge is based on its payment plan services role. As Pelican's financing partner, Mepco had access to sales metrics, transactional data, cancellation and refund activity, and consumer complaints associated with Pelican-marketed contracts, all of which signaled deceptive or unlawful sales practices by Pelican.

184.    Despite this knowledge and despite its contractual authority to suspend financing, reject transactions, or terminate its relationship with Pelican, Mepco continued to approve, fund, and profit from contracts procured through Pelican's false and disparaging statements.

185.    Mepco's continued financing supplied the essential means by which Pelican's injurious falsehoods were disseminated and allowed that conduct to continue unabated, thereby materially contributing to and ratifying the false statements.

186.    Mepco acted with malice within the meaning of Missouri law by knowingly supporting and profiting from sales obtained through false statements that directly impugned the quality, acceptance, and reliability of CarShield's products and were calculated to cause pecuniary harm to CarShield.

187.    As a direct and proximate result of Mepco's knowing participation in and ratification of Pelican's injurious falsehoods, CarShield has suffered special damages, including lost revenue, loss of goodwill, and reputational harm, as previously alleged.

## COUNT 10

**Unfair Competition under Missouri Law**
**Vicarious Liability, Agency, Apparent Authority, Ratification**
(CarShield v. Mepco)

188.    CarShield restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

189.    Pelican engaged in unfair competition by employing deceptive sales practices and false advertising to divert customers from CarShield through misrepresentations about CarShield's coverage, claims administration, and acceptance by repair facilities.

190.    Mepco is liable for unfair competition because it knowingly participated in, materially contributed to, and ratified Pelican's deceptive conduct by providing indispensable

financing for contracts procured through those practices and continuing to do so with knowledge of the misconduct.

191.    Mepco's conduct went beyond mere funding. By exercising discretionary control over whether individual transactions would be funded, by retaining the right to terminate financing at will, and by continuing to fund Pelican's sales after learning of the deceptive practices, Mepco enabled and sustained the unfair competition.

192.    Mepco's continued funding of Pelican's deceptive sales allowed Pelican to expand and perpetuate its telemarketing campaign, directly contributing to the diversion of customers, confusion in the marketplace, and erosion of CarShield's goodwill.

193.    As a direct and proximate result of Mepco's knowing participation in and ratification of Pelican's unfair competition, CarShield has suffered damages, as previously alleged.

## COUNT 11

**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act**
(CarShield v. Pelican)

194.    CarShield restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

195.    CarShield owns protectable trade secrets within the meaning of the DTSA, 18 U.S.C. § 1839(3), including CarShield's Confidential Customer Information. This information derives independent economic value from not being generally known or readily ascertainable by competitors because it enables precise, targeted access to consumers who already hold active vehicle protection plans, including information concerning customer identities, contact details, covered vehicles and their vehicle identification numbers, coverage status, contract term or renewal information, and contract and payment data.

196.    Access to CarShield's Confidential Customer Information allows a competitor to sidestep the time, expense, and uncertainty attendant to identifying, qualifying, and soliciting prospective customers in the vehicle service contract market. It enables a competitor to target CarShield's customers directly—a group of consumers who have already demonstrated that they are interested in purchasing and/or have purchased vehicle service contracts—including at moments when those customers may be nearing the term of their contract or are susceptible to cancellation or renewal decisions. CarShield's Confidential Customer Information is therefore commercially valuable to competitors and confers a significant competitive advantage on any party that improperly acquires or uses it.

197.    Pelican obtained CarShield's Confidential Customer Information from sources presently unknown to Plaintiffs but which it believes will become known through discovery.

198.    Pelican obtained CarShield's Confidential Customer Information, knowing full well it had to have been misappropriated and shared with Pelican unlawfully without the permission or authorization of CarShield. The information was nonpublic, customer-specific, and included sensitive details that could only have originated from CarShield or a CarShield confidential commercial relationship subject to secrecy obligations.

199.    As alleged above, Pelican used and misappropriated CarShield's Confidential Customer Information to place or supplement its targeted telemarketing calls to CarShield customers for the purpose of inducing them to cancel or terminate their CarShield coverage and purchase Pelican-marketed vehicle service contracts through deceptive and misleading sales practices.

200.    Pelican's use and misappropriation of CarShield's Confidential Customer Information was willful and malicious.

201.    Pelican's use and misappropriation of CarShield's Confidential Customer Information involved CarShield's trade secrets used in interstate commerce, including nationwide customer data and multistate telemarketing campaigns, bringing the conduct squarely within the scope of the DTSA.

202.    As a direct and proximate result of Pelican's use and misappropriation, CarShield has suffered actual damages, including lost customers, lost revenue, increased cancellation and refund activity, non-renewals, loss of goodwill, and unjust enrichment to Defendants.

203.    CarShield is entitled to injunctive relief, compensatory damages, unjust enrichment, exemplary damages for willful and malicious misappropriation, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3).

## PRAYER FOR RELIEF FOR ALL COUNTS

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants, and that this Court:

A.    Award Plaintiffs all damages and other monetary relief available as a result of Defendants' false advertising and tortious interference scheme, such damages and monetary relief including, but not limited to, actual damages, lost profits, Defendants' profits, statutory damages, enhanced damages, treble damages, attorneys' fees, and all other monetary relief available under 15 U.S.C. § 1117 and other applicable federal and state laws in an amount to be determined at trial;

B.    Order an accounting and disgorgement of all profits, revenues, and other benefits unjustly obtained by Defendants as a result of their unlawful conduct;

C.    Enter preliminary and permanent injunctive relief enjoining Defendants and their successors, assigns, affiliates, employees, partners, and anyone acting in concert with them or at

their behest or direction from making any false or misleading statements about Plaintiffs, including the statements (and any similar statements) detailed above in this complaint;

D.      Enter preliminary and permanent injunctive relief enjoining Defendants and their successors, assigns, affiliates, employees, partners, and anyone acting in concert with them or at their behest or direction from using any CarShield Confidential Customer Information, and ordering Defendants to return to Plaintiffs and permanently delete all hard copy and electronic copies of all CarShield Confidential Customer Information in their possession, custody and/or control; and

E.      Award Plaintiffs such other and further relief, including costs and pre and post-judgement interest, as this Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: January 29, 2026

Respectfully submitted,

/s/Jeffrey H. Kass
Jeffrey H. Kass (E.D. Mo. #60672)
Dickinson Wright PLLC
1125 17th Street, Suite 550
Denver, CO 80202
Tel: (303) 723-8403
Fax: (844) 670-6009
jkass@dickinsonwright.com

and

/s/Alfred D. Carry
Alfred D. Carry (admitted *pro hac vice*)
Dickinson Wright PLLC
1825 I Street NW, Suite 900
Washington, DC 20006
Tel: (202) 466-5960
Fax: (844) 670-6009
acarry@dickinsonwright.com
DC Bar #1011877

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was electronically filed in this case with the clerk of the court and served on this 29th day of January, 2026, through the Court's CM/ECF system, which will send notification of this filing to all counsel of record.

/s/Jeffrey H. Kass
Jeffrey H. Kass
*Counsel for Plaintiffs*